# GONZALO COTTO *v.* UNITED TECHNOLOGIES CORPORATION, SIKORSKY AIRCRAFT DIVISION
## (SC 15963)

Callahan, C. J., and Borden, Berdon, Katz, Palmer, McDonald and Peters, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

1

Argued April 29—officially released October 12, 1999

*Karen Lee Torre*, for the appellant (plaintiff).

*Edward J. Dempsey*, for the appellee (defendant).

*Martin B. Margulies* and *Philip D. Tegeler* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Opinion*

PETERS, J. This case concerns the applicability of General Statutes § 31-51q[1] to a private workplace dispute involving the placement of American flags at

---

[1] General Statutes § 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship

employee workstations. The principal issue is whether the statute provides any protection for infringement of an employee's rights of free speech and association at a private workplace. The secondary issue is whether, under the circumstances of this case, the employee has alleged facts in his complaint that are sufficient to demonstrate an infringement of his constitutional rights within the confines of the statute. We conclude that, although § 31-51q provides private workplace protection against the impairment of constitutional rights, the complaint presently before us does not allege a cognizable impairment of such rights. Accordingly, we affirm the judgment of the Appellate Court.

The plaintiff, Gonzalo Cotto, filed a two count complaint against the defendant, Sikorsky Aircraft, Division of United Technologies Corporation,[2] seeking damages for his wrongful discharge, both as a statutory claim under § 31-51q and as a common-law claim under *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474, 427 A.2d 385 (1980). These claims arose out of the plaintiff's discharge from employment by the defendant following the plaintiff's refusal to display an American flag at his workstation. The trial court, after granting the motion of the defendant to strike the complaint in its entirety, rendered a judgment in favor of the defendant.

The plaintiff appealed to the Appellate Court only with respect to the denial of his statutory claim for relief. The majority of that court, *Dupont, J.*, and *Daly*,

between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

[2] Although the plaintiff named as defendants both Sikorsky Aircraft and United Technologies Corporation, the parties throughout this litigation have considered these two entities as one. Following the practice of the parties, we refer to the defendant in the singular.

*J.*, concluded, contrary to the view of the trial court, that the statute encompassed free speech claims at the workplace.Nevertheless, it affirmed the judgment on the ground that the plaintiff's refusal to display the flag did not qualify as the kind of conduct protected by the statute. *Cotto* v. *United Technologies Corp.*, 48 Conn. App. 618, 632, 711 A.2d 1180 (1998). In a concurring opinion, Judge Hennessy agreed with the trial court's narrower reading of the statute. We granted the plaintiff's petition for certification to appeal to this court.[3]

The opinion of the Appellate Court recites the relevant background. "The plaintiff alleged in his complaint that he was employed on a full-time basis by the defendant for approximately twelve years. The relevant portions of other allegations of the plaintiff's complaint are . . . as follows: 'On or about April 22, 1991, the defendant, acting through [its] management personnel, distributed American flags to employees in the plaintiff's department and it was expected that all employees would display American flags at their workstations. The plaintiff declined to display the American flag and further gave his opinion on the propriety of coercing or exerting pressure on employees to display the American flag. As a result of the plaintiff's refusal to display the American flag and as a direct and proximate result of his comments with respect to displaying the flag, he was subjected to threats and harassment from his coworkers. Said threats and harassment were directed toward him by his coworkers with the full support and

---

[3] We granted certification to appeal limited to the following issue: "Did the Appellate Court properly hold that the plaintiff's expression or his refusal to display a political symbol was not protected by the first amendment to the United States constitution or by article first of the constitution of Connecticut." *Cotto* v. *United Technologies Corp.*, 245 Conn. 915, 719 A.2d 1167 (1998).

The defendant filed a statement of alternative grounds for affirmance premised on the proposition that § 31-51q does not guarantee the right of free speech on an employer's private property.

encouragement of the defendant. The plaintiff's refusal to display the American flag and his expression of his opinion regarding the company's policy that employees must display the American flag at their workstations were absolutely protected by the First Amendment of the United States Constitution and Article First of the Constitution of the State of Connecticut. Subsequent to the plaintiff's suspension from employment, he was permanently discharged from employment on or about May 16, 1992, on account of the plaintiff's aforementioned behavior and expression of opinion, all of which were constitutionally protected. The defendant's act of discharging the plaintiff from employment violated the plaintiff's rights pursuant to . . . § 31-51q, as the plaintiff's refusal to display the American flag and his expression of opinion regarding the same did not substantially or materially interfere with his bona fide job performance or the working relationship between him and the defendant.' " Id., 620–21.

To determine whether the plaintiff has stated a valid cause of action, we must decide two questions. First, as a matter of statutory construction, does § 31-51q provide any remedy for an alleged impairment of constitutional rights of free speech at a privately owned workplace? We conclude that the statute does provide such a remedy under the proper circumstances. Second, as a matter of statutory application, does the statute provide a remedy for the employer conduct alleged to have occurred in the present case? We conclude that the statute has no application to the facts alleged in the complaint presently before us. Accordingly, we affirm the judgment of the Appellate Court.

I

STATUTORY CONSTRUCTION

To determine whether the conduct of private employers is within the scope of § 31-51q, we turn to well

established principles of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *General Motors Corp.* v. *Dohmann*, 247 Conn. 274, 286, 722 A.2d 1205 (1998); *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 32, 699 A.2d 101 (1997); *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431, 692 A.2d 742 (1997).

Section 31-51q creates a statutory cause of action for damages against "[a]ny employer" for "any employee" who has been subjected "to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state . . . ." On its face, the statute extends the protection of federal and state constitutional rights in two respects. It provides coverage for private employees as well as for governmental employees, and it imposes liability on private employers as well as governmental employers.[4] What is at issue is whether, in so doing, it provides coverage for an employee's exercise of constitutional rights on private property, namely at a private employer's workplace.

Our point of departure must be the language of the statute itself. The statute identifies, as the class of those

[4] It is undisputed that the first amendment protects expressions of public interest by government employees that occur at the workplace. *Rankin* v. *McPherson*, 483 U.S. 378, 384–85, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987); *Connick* v. *Myers*, 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Schnabel* v. *Tyler*, 230 Conn. 735, 749, 646 A.2d 152 (1994).

subject to a damages action, "[a]ny employer, including the state and any instrumentality or political subdivision thereof . . . ."

Read literally, the language employed by the legislature unconditionally includes private employers as well as public employers within the terms of the statute. The phraseology of expressly "including" governmental employers is not readily transmuted into the manifestation of an intention of impliedly "excluding" private employers. The use of the word "any" at the outset of the statutory language reenforces its natural reading to encompass rights at a private workplace. Had the legislature meant to confine the statute to the conduct of governmental actors, as the defendant urges us to conclude, the legislature presumably could have done so directly, by adding "public" or "governmental" before "employer." To read the statute as limited to governmental actors requires either the deletion of words that the statute contains or the addition of a word that it does not contain. That is not a preferred method of statutory analysis.[5]

---

[5] The contrary view expressed by Justice Borden's concurring and dissenting opinion relies, in part, on the constitutional rights of employers to express their own political views. The defendant in the present case has articulated no such claim. In particular, unlike the defendant in *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), cert. denied, 488 U.S. 1043, 109 S. Ct. 869, 102 L. Ed. 2d 993 (1989), the defendant in the present case has not alleged that statutory protection of appropriately limited expressions of points of view on matters of public concern by its employees would pose a threat to its economic or physical well-being.

We disagree, therefore, with Justice Borden's view that *Redgrave* sheds significant light on the outcome of this case. As a matter of law, we note that the court's opinion in *Redgrave* expressly eschews a decision based on constitutional grounds, finding "no need to discuss the existence or content of a First Amendment right not to perform an artistic endeavor." Id., 911. More important, as a matter of fact, in this case, unlike *Redgrave*, the defendant has not proffered a factual claim that it was confronted with the risk that its own views about the flag would be confused with that of the plaintiff, who is not a celebrity and who is not otherwise known to the public at large. We need not decide today, therefore, how possibly conflicting rights of free speech between employer and employee should be resolved pursuant to § 31-51q.

The remainder of § 31-51q confirms the legislature's intent to provide coverage for the exercise of constitutional rights at a private as well as at a public workplace. Having granted a right of recovery for a constitutional claim, the statute limits that right with a proviso, stating that such a claim is not actionable if the activity "substantially or materially interfere[s] with the employee's bona fide job performance or the working relationship between the employee and the employer . . . ." The legislature's manifest concern for the special needs of the workplace is at least as relevant in the private workplace as it is in the public workplace. When reading a statute, "we must consider the statute as a whole . . . reconciling its separate parts in order to render a reasonable overall interpretation." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 349, 680 A.2d 1261 (1996); *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208, 232, 477 A.2d 988 (1984) (presumption of purpose behind every sentence, clause or phrase).

Construing § 31-51q to encompass the infringement of constitutional rights at the private workplace, as the statute literally reads, is entirely consistent with the purpose of the statute. The statute plainly was intended to protect the first amendment and related state constitutional rights of working men and women. As a remedial statute, § 31-51q deserves a generous construction

We do not dispute the possibility that circumstances may arise when the rights of an employee under § 31-51q may conflict with the employer's own free expression rights. If and when that case does arise, we will be required to resolve any such conflict in light of the particular facts and circumstances then presented. Notably, § 31-51q contemplates statutory relief under the appropriate circumstances, because it explicitly limits its applicability to "activity [that] does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer . . . ." The Massachusetts statute that was at issue in *Redgrave* had no such limitation.

that implements its purpose at one of the important places, the private workplace, in which those rights may be impaired. See *Reid* v. *Covert*, 354 U.S. 1, 40, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957) (Bill of Rights should be broadly construed); *Dysart Corp.* v. *Seaboard Surety Co.*, 240 Conn. 10, 18, 688 A.2d 306 (1997) (remedial statutes should be read broadly); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 66–85, 469 A.2d 1201 (1984) (*Peters, J.*, dissenting) (advocating broad interpretation of article first, §§ 4 and 14).

The legislative history of § 31-51q supports a literal reading of the statute that implements its remedial purpose. The following colloquy among Senator Howard T. Owens, Jr., who sponsored the bill, and three opponents of the bill, namely, Senators Eugene A. Skowronski, John G. Matthews and Anne P. Streeter, is illuminating:[6]

"Senator Owens: This bill, Mr. President, would make any employer, including the state or any municipality, liable to any employee who is disciplined or discharged because such employee exercises . . . rights guaranteed by the First Amendment to the United States Constitution unless such activity substantially interfered with the employee's bona fide job performance, the liability would be for damages including punitive damages and reasonable attorney's fees . . . .

"Senator Skowronski: Senator Owens, what have been the instances or examples of such discharge in the State of Connecticut that would require passage of this bill which I think has many, many potential problems to it? . . .

---

[6] When analyzing the legislative history of a statute, we attach special significance to the statements of the legislators who sponsor the bill at issue, such as Senator Owens in the present case. See, e.g., *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 395 n.22, 709 A.2d 1116 (1998).

"Senator Owens: [I]n some instances private sector employees have been able to speak without fear of retribution. However, in many areas involving federal occupational safety laws, involving labor affairs where complaints have been made, there have been effects borne out on the employees. I hope that answers your question, Senator Skowronski. . . .

"Senator Skowronski: Only partly . . . . Have there been cases of discharges and disciplines? Have they been numerous? . . .

"Senator Owens: Sometimes, there [are] not always serious abuses and there might not be a proliferation of complaints coming in, but in order to make sure that the rights are protected under the Constitution of the United States, and also under our State Constitution, we have to make sure that there is a warning and a safeguard going out. So that's why it makes it a very excellent bill." 26 S. Proc., Pt. 11, 1983 Sess., pp. 3597–600.

Next, Senators Skowronski, Matthews and Streeter all voiced their opposition to the bill. "Senator Skowronski: I rise to oppose the bill because I think it really has the potential for creating many, many problems. We are talking about the exercise of First Amendment rights, some of the broadest rights we have the Freedom of Speech, in particular. I think it is going to really create strain and uncertainty in the labor-management area and in the employer-employee relationship to pass this law and to say that someone can't be disciplined or discharged for exercising their right of free speech. I would assume this may give anyone the right to say anything *to his employer* or any other employee and say, well, I'm just exercising my right of free speech even though the exercise of that right of free speech may have a very adverse impact on the orderly operation of the business, and on the relationship between the

employer and the employee. And this is not only going to apply to private industry but it is going to apply to all of our municipalities in the state itself, and I don't think that we should create this kind of or open this kind of a can of worms unless there is a substantial showing that a problem exists out there wherein employers or the state or our towns are disciplining or discharging unfairly employees for exercising their First Amendment rights. I don't think there is such a showing here, and I think that this is just going to create a lot of problems in the workplace for no good reason. So for that reason, I would oppose the bill and ask for a roll call vote. . . .

"Senator Matthews: I rise in support of Senator Skowronski's position on the bill. It seems to me that what we have here, as I think has been touched upon, is you have the First Amendment under the Federal Constitution which indicates there are certain elements which are available and free, ah, it doesn't seem to be necessary that we now have to identify that again in the state statutes by providing the kind of a bill that we have here which does, as it has been pointed out, restrict, in my mind at least, a lot of potential employer-employee relationships which already are being tied down severely. I am not going to go into further detail because I think most of the ideas have been expressed. I think that we don't need this bill in the sense that it is indicated in the comments of Senator Owens. I think it is a bill which just adds something more to something that is already in existence through the Federal First Amendment of the Constitution. . . .

"Senator Streeter: I also rise to oppose this bill for the same reasons that Senator Skowronski outlined. It seems to me that we have the Federal First Amendment right to cover the general aspect and yesterday we passed the whistle blowing legislation which does guarantee that an employee who is trying to speak out

against some sort of an injustice within his workplace does have that guarantee. And in the absence of any dramatic incidents as . . . told to us about the need for this kind of legislation, I think it would be far better for us to deny it." (Emphasis added.) Id., pp. 3600–603.

This colloquy demonstrates that the problem that the legislature intended to address could well be located at a place of private employment. Senator Owens' references to "complaints" involving the federal occupational safety laws and to "labor affairs" can readily be understood to relate to the concerns of employees at a private workplace. Id., p. 3599. Those who opposed enactment of the legislation were addressing the same situs. It is hard to see what else Senator Skowronski would have had in mind when he commented that the bill "may give anyone the right to say anything to his employer or any other employee and say, well, I'm just exercising my right of free speech . . . ." Id., p. 3601. It is not plausible that the senators' colloquy impliedly was limited to issues of employee discipline arising out of expressions of employee opinions only on public property.[7]

Concededly, there is one piece of legislative history that can be read to support the narrower reading of the statute that the defendant urges us to adopt. The remarks of Representative Richard D. Tulisano, the bill's sponsor in the House of Representatives, were as follows: "Mr. Speaker, this legislation would establish

---

[7] Although the comments of opponents of a bill ordinarily are entitled to less weight than are those of its proponents, there are instances in which we have found them to be relevant. See, e.g., *Castagno* v. *Wholean*, 239 Conn. 336, 349, 684 A.2d 1181 (1996) (citing statement made on Senate floor by senator who opposed bill); *Washington* v. *Meachum*, 238 Conn. 692, 713–14, 680 A.2d 262 (1996) (citing statements made on Senate floor by two senators who opposed bill). Statements made on the floor of the legislature may be relevant even if they are not controlling. *Winchester Woods Associates* v. *Planning & Zoning Commission*, 219 Conn. 303, 310, 592 A.2d 953 (1991).

a cause of action for individuals against employers who may be disciplined because of exercising of their first amendment rights. This makes it clear that they do have in fact a cause of action against an employer, and that is exercise of rights which have no way to do with job performance, *or on the job*, or interfering with their employment. I would move its passage. I think it's important for us to put on the books, legislation which indicates that we are in favor of freedom of speech, freedom of religion, and freedom of the press, and this is our one way of protecting those rights of individuals, so they do not have to be afraid to express themselves because of fear of job loss." (Emphasis added.) 26 H.R. Proc., Pt. 15, 1983 Sess., p. 5289.

The question raised by Representative Tulisano's remarks is whether he intended to convey a job site limitation by his use of the phrase "on the job." Although his referent is not entirely clear, in context we are persuaded that he should be understood to have stated that an employee should not be disciplined for the exercise of his "first amendment rights," as long as that exercise does not affect his performance "on the job."

Finally, a literal construction of § 31-51q to encompass the protection of employee constitutional rights at a private workplace is entirely consistent with the broad array of statutory and common-law rights that are an acknowledged part of the wider legal landscape of relationships between employers and employees. See generally *Butler* v. *Hartford Technical Institute, Inc.*, 243 Conn. 454, 461, 704 A.2d 222 (1997) (statutes should be interpreted in light of existing statutes because legislature is presumed to have created consistent body of law).

As the Appellate Court aptly observed, § 31-51q is analogous to other state statutes that safeguard an employee from discharge for expressions of opinion at

a private workplace. "Such statutes include General Statutes § 2-3a, which prohibits retaliatory action by a private employer against an employee who runs for or serves in the state legislature; General Statutes § 31-51m, which prohibits retaliatory action by a private employer against an employee who reports a violation or suspected violation of laws or regulations (employee 'whistle-blowing' protection); General Statutes §§ 31-40k and 31-40o, which prohibit retaliatory action by a private employer against an employee for seeking information about toxic substances used at the workplace; General Statutes § 31-48b, which provides criminal sanctions against a private employer who records or monitors activities of employees in areas designed for the personal health or comfort of the employees, or in areas for the safeguarding of employee possessions such as restrooms, lockers and lounges; General Statutes § 31-51, which provides for a fine against a private employer who acts to prevent an employee from securing employment elsewhere; General Statutes § 31-51g, which provides for a fine against a private employer for requiring an employee to take a polygraph test; General Statutes §§ 31-104 and 31-105, which make it an unfair labor practice for private employers to prevent employees from bargaining collectively; General Statutes § 31-290a, which prevents private employers from using retaliatory measures against an employee who files a claim for workers' compensation benefits; General Statutes § 31-379, which prevents private employers from using retaliatory measures against an employee who files a complaint concerning a violation of the Occupational Safety and Health Act; General Statutes § 51-247a, which prohibits retaliatory measures by a private employer against an employee for responding to a summons to act as a juror or for serving as a juror; General Statutes § 52-361a (j), which prohibits a private employer from retaliatory measures against

an employee because of a wage execution; General Statutes § 53-303e (b), which prohibits a private employer from retaliatory measures against an employee for not working on Saturdays because of religious observance; General Statutes § 27-33, which prohibits retaliatory action by a private employer against an employee who absents himself from his work duties while engaging in military or naval duty; General Statutes § 28-17, which prohibits the discharge of an employee because of membership in an organization engaged in civil preparedness or because of eligibility for induction into the armed services of the United States; and General Statutes § 9-365, which provides for a fine of 'any person' who threatens a person in his employ or who discharges an employee because of any vote of the employee at any election."[8] *Cotto* v. *United Technologies Corp.*, supra, 48 Conn. App. 626–28.

In addition, this court has recognized the existence of a common-law "public policy exception to the employment at-will rule in an effort to balance the competing interests of employer and employee." *Antinerella* v. *Rioux*, 229 Conn. 479, 492, 642 A.2d 699 (1994) (application of doctrine appropriate where defendant is accused of discharging plaintiff in order to be able to violate statute), citing *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 471 (creating tort of wrongful discharge where defendant allegedly discharged plaintiff because he insisted that defendant comply with

---

[8] Although it can be argued that many of these statutes are somewhat distinguishable because the employees' protected expressions relate to the upholding of a law, that is not true for all of the statutes. See, e.g., General Statutes § 31-48b (providing criminal sanctions against private employer who records or monitors employee's activities in areas designed for personal health or comfort of employees, or in areas for safeguarding employee possessions); General Statutes § 31-51g (providing fine against private employer if it requires employee to take polygraph test); General Statutes § 53-303e (b) (prohibiting private employer from retaliating against employee for not working on Sabbath day because of religious observance).

Connecticut Uniform Food, Drug and Cosmetic Act). Like the statutes to which the Appellate Court referred, this common-law right of action also imposes policy limitations on a private employer's authority in the workplace.

The public policy represented by this broad panoply of existing statutory and common-law rights in the private workplace makes it entirely reasonable to conclude that the legislature, in enacting § 31-51q, intended to afford similar rights to freedom of expression in the same place.[9] It is the contrary conclusion that would be more difficult to justify.

In light of all the foregoing, we are persuaded that the legislature meant what it said. Section 31-51q extends protection of rights of free speech under the federal and the state constitutions to employees in the private workplace. The statute is not limited to freedom of speech in the public arena.

II

STATUTORY APPLICATION

Our conclusion that § 31-51q includes protection for free speech rights under some circumstances does not mean that it does so under all circumstances. We must decide whether, on the facts as alleged in his complaint, the plaintiff has stated a cause of action under the statute. Like the majority of the Appellate Court, we conclude that he has not done so.

---

[9] The legislature's understanding of the policy implications of § 31-51q is demonstrated, furthermore, by its inclusion of a safety net to protect employers from frivolous claims of constitutional violations. The section provides, in relevant part: "If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer." Therefore, an employer that successfully defends itself from an unwarranted claim under § 31-51q is not left without a remedy.

Two preliminary observations are in order. One concerns the limitations that the legislature has engrafted onto the rights created by § 31-51q. The other concerns the significance of the fact that the dispute between the plaintiff and the defendant relates to the placement of an American flag.

As a statutory matter, a statute that protects constitutional rights in the workplace should not be construed so as to transform every dispute about working conditions into a constitutional question. The legislature made its intention in that respect clear by stating expressly, in § 31-51q, that the statute provides a cause of action only against discharge for expressions of opinion that do "not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer . . . ." The statute applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen. *Connick* v. *Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 783–84, 734 A.2d 112 (1999); see also *Lewis* v. *Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999).

As a constitutional matter, the fact that the plaintiff protested an order to display the flag does not mean that he automatically has stated a cognizable constitutional claim. Although the United States Supreme Court has identified the "expressive element in conduct relating to flags"; *Texas* v. *Johnson*, 491 U.S. 397, 405, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989); it also has held that the constitutional implications, under the first amendment, of conduct with respect to the flag depend on "the context in which [that conduct] occurred." Id.

In the present case, the nub of the plaintiff's allegation of employer misconduct implicating his first amendment rights is that "[o]n or about April 22, 1991, the

defendants, acting through their management personnel, distributed American flags to employees in the plaintiff's department and it was expected that all employees would display American flags at their workstations."[10] Significantly, the plaintiff has *not* alleged that: (1) he was directed to manifest his patriotism by saluting the flag or otherwise affirming his allegiance thereto; (2) he was directed to affix the flag to his person or to his private property; or (3) he was indirectly directed to associate himself with the symbolism of the flag because the location of his workstation was such that members of the public, or his fellow employees, reasonably could have attributed that symbolism to him personally. In an appeal from the granting of a motion to strike, we must read the allegations of the complaint generously to sustain its viability, if possible; *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 68, 700 A.2d 655 (1997); but even a generous instruction does not permit stretching the plaintiff's complaint to include these missing allegations.

The long and short of the performance that the defendant allegedly required of the plaintiff was that he was directed to take a flag from place A, a box containing such flags, and move it to place B, his workstation. Even though the flag is a symbol of government, the plaintiff has cited no judicial authority for the proposition that every work assignment involving the flag implicates an employee's constitutional rights of free speech. See *Troster* v. *Pennsylvania State Dept. of Correction*, 65 F.3d 1086, 1092 (3d Cir.), cert. denied, 516 U.S. 1047,

---

[10] We recognize that the plaintiff also alleges that the defendant supported the threats and harassment that he received from his coworkers when he refused to display the flag. As we read the complaint, however, the alleged culpability of the defendant's conduct depends upon whether the plaintiff was justified in his refusal to follow the defendant's direction. The plaintiff states in his brief that the reason that he is entitled to relief is that his expression of his beliefs "was in reaction to the act of the employer itself coercing him to display the symbol."

116 S. Ct. 708, 133 L. Ed. 2d 663 (1995) (no compelled expression, in violation of first amendment, in requirement that employee wear flag patch on uniform).

It is instructive to compare the plaintiff's case with that which would have arisen if, hypothetically, he had arrived at his workstation to find that his supervisor had affixed a flag to every workstation including his own. Although the plaintiff might have felt aggrieved by finding the flag there, he would have been hard put to articulate a viable constitutional basis for his grievance. He could not have relied on *Board of Education* v. *Barnette*, 319 U.S. 624, 633–34, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943), because of the absence of any direction that he do or say anything related to his own political beliefs. He could not have relied on *Wooley* v. *Maynard*, 430 U.S. 705, 713, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), because his own property would not have been commandeered to convey to the public a political belief to which he did not subscribe. He could not have relied on *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569–70, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995), because he would not have been required to be identified or associated with his employer's political message. In sum, the message of the flag reasonably could not have been attributed to him personally. Under such circumstances, even though the symbolism of the flag may often be a matter of public concern, a complaint based on having to see the flag at a workstation would not, in all probability, have stated a valid constitutional claim.

From a first amendment point of view, it is difficult to see a persuasive distinction between that hypothetical case and the case presently before us. A direction to the plaintiff to affix a flag to his workstation did not require him either to manifest or to clarify his personal political beliefs. Because a flag was to be affixed to

each workstation, and because the plaintiff's workstation was not exposed to public scrutiny, he was not required to assume the risk that others might attribute to him any political beliefs about the flag that he did not share. In other words, the direction to the plaintiff, as a matter of law, was *not* a "coercion of belief." *Branti v. Finkel*, 445 U.S. 507, 515–16, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980).

The plaintiff's claim, therefore, devolves into the assertion that, although he was not, in law, compelled to articulate *or to refute any political belief*, his aversion to the positioning of a flag at his workstation gave him a constitutional right to protest. It may be that a managerial decision about a new placement of flags in the workplace is a grievable change in working conditions, but that would not be a constitutional claim. With respect to any such constitutional claim, it suffices in this case that the plaintiff has not made it.[11] Throughout, his argument has focused on the proposition that the conduct of the employer has compelled him to engage in an expression of political speech. See footnote 1 of this opinion. That is the argument that cannot be sustained either by the pleadings or by the case law cited by the plaintiff.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, J., concurred, and CALLAHAN, C. J., and BORDEN and MCDONALD, Js., concurred in the result.

BORDEN, J., with whom CALLAHAN, C. J., joins, concurring and dissenting. I agree with the majority in its ultimate conclusion that the plaintiff has not stated

---

[11] The plaintiff states, in his brief, that he is entitled to relief because his expression of his beliefs "was in reaction to the act of the employer itself *coercing him* to display the symbol." (Emphasis added.)

a valid cause of action under General Statutes § 31-51q.[1] I disagree with the conclusion of the majority, however, expressed in part I of its opinion, that § 31-51q applies to the plaintiff's expression at his private employer's workplace. I conclude, to the contrary, that the statute is intended to reach only speech or conduct of a private employee that, based on its location or circumstance, is or would be protected against governmental, and not private, action. Concomitantly, however, in my view the statute does not reach expressive activity, such as that alleged by the plaintiff, that takes place on a private employer's property and involves only restrictive activity by his private, nongovernmental employer, because the constitutional guarantees protected by the statute do not reach such activity. I therefore concur in the result reached by the majority, but dissent from its analysis of the controlling statute.

I

I address briefly the three fundamental flaws in the majority's analysis of § 31-51q. First, despite its repeated references to "a literal reading of the statute," to a "literal construction of § 31-51q," and to the language of the statute as its "point of departure," the majority ignores the core of the statute, namely, that it subjects to civil liability for damages any employer

---

[1] General Statutes § 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

who disciplines or discharges an employee "*on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or sections 3, 4 or 14 of article first of the Constitution of the state* . . . ." (Emphasis added.) Nowhere does the majority discuss the meaning of this language, which, properly interpreted, compels the conclusion that the statute does not apply to this case. Moreover, in assuming without analysis that this language poses no obstacle to its conclusion, the majority also assumes that the legislature that enacted this language was uninformed about the subject matter of its own legislation.

Second, the majority sets up the proverbial straw man by characterizing the defendant's argument as limited to the proposition that "the legislature meant to confine the statute to the conduct of governmental actors . . . ." This is an unduly cramped reading of the defendant's position, which is that the statute does not reach private speech on an employer's private property, and that it would raise serious constitutional questions if it were construed to do so.

Furthermore, even if that were the sum of the defendant's argument, we have never considered ourselves barred from a proper interpretation of a statute by the litigants' specific assertions. Moreover, the defendant's position, properly understood, simply mirrors the reasoning of the trial court in this case, and the reasoning of Judge Hennessy's concurring opinion in the Appellate Court. See *Cotto* v. *United Technologies Corp.*, 48 Conn App. 618, 632, 711 A.2d 1180 (1998) (*Hennessy, J.*, concurring). It is difficult to understand why we should read the defendant's reliance on those opinions more narrowly than the opinions themselves.

Third, the majority, in footnote 5 of its opinion, suggests that I have raised on my own the question of "the constitutional rights of employers to express their own

political views," and that the defendant has not done so. Thus, the majority dismisses one of the central points of this dissent with the statement that if and "when the rights of an employee under § 31-51q conflict with the employer's free expression rights . . . we will be required to resolve any such conflict in light of the particular facts and circumstances presented." The majority, however, mischaracterizes the argument of the defendant. In reliance on *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), cert. denied, 448 U.S. 1043, 109 S. Ct. 869, 102 L. Ed. 2d 993 (1989), the defendant in its brief explicitly argued that "a private employer does not have a constitutional right to discriminate or retaliate, *but does have a constitutional right to speak that is on an equal footing with the free speech right of others,*" and explicitly pointed to "*the difficulty in enforcing through a statute the protection of an employee's speech against an employer who has an equal constitutional right to be free from state interference on a matter of speech* . . . ." (Emphasis added.)

Contrary to the assertion of the majority, therefore, the conflict between the employee's and the employer's expressive rights *is* presented by this case, at least insofar as that conflict must necessarily inform the question of statutory interpretation that this case presents. Moreover, that conflict is presented "in light of the particular facts and circumstances presented" by the plaintiff's allegations in this case. I turn, therefore, to the question of statutory interpretation presented in this appeal.

## II

The defendant moved to strike the plaintiff's complaint on the ground that it failed to state a cause of action under § 31-51q. The trial court agreed, reasoning that the "[p]laintiff's speech at his workplace is not

protected by the first amendment of the United States Constitution or section 3, 4 or 14 of article first of the Connecticut constitution." The gist of the trial court's reasoning was that, because both the first amendment and article first protect speech only from governmental, and not private, conduct, the statute did not protect the plaintiff's expressions as against his private employer at his private, as opposed to a governmental, workplace.

The Appellate Court, although reaching the same result in a divided opinion, took a different view of the scope of the statute. The majority of that court concluded "that § 31-51q applies to some activities and speech that occur at the workplace . . . ." *Cotto* v. *United Technologies Corp.*, supra, 48 Conn App. 628. Analogizing the scope of the statute to the protection afforded governmental employees under 42 U.S.C. § 1983,[2] the majority reasoned that the determination of whether such protection was afforded required the drawing of a line, on a case-by-case basis, "between nonconstitutional speech involving employment conditions and practices and constitutional speech involving public issues." Id., 629. Applying that standard, the majority then concluded that the "issue of whether the [defendant] should have 'expected' the plaintiff to display a flag may be the subject of a grievance involving a condition of employment, but it is not a matter of public interest." Id., 631. Therefore, according to the Appellate Court majority, the plaintiff had not stated a valid cause of action under § 31-51q. Id., 632.

---

[2] Title 42 of the United States Code, § 1983, provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

The concurring opinion of Judge Hennessy took a narrower view of the statute. In his view, § 31-51q simply did not apply to the facts alleged by the plaintiff because "the statute applies only to violations of constitutional rights." Id., 634 (*Hennessy, J.*, concurring). Judge Hennessy reasoned that because both the first amendment and article first apply only to the acts of the state, and not to the acts of private persons; id., 632; and because the speech, having occurred on private property, was not protected by either constitutional provision, the statute did not apply to the present case. Id., 633-34.

On appeal to this court, the plaintiff claims that, although the majority of the Appellate Court was correct in its preliminary conclusion that § 31-51q applies to the present case, it was incorrect in its ultimate conclusion regarding whether the plaintiff's expressive activity was protected. The defendant claims that the Appellate Court was correct in its ultimate conclusion that the plaintiff's conduct was not protected. The defendant also presents the reasoning of Judge Hennessy's concurring opinion, which mirrors the reasoning of the trial court, as an alternate ground for affirmance of the judgment of the Appellate Court; see Practice Book § 63-4; namely, that § 31-51q does not apply to the facts alleged by the plaintiff. I agree with the defendant's alternate ground for affirmance.

Whether § 31-51q applies to the events resulting in the discharge of the plaintiff by the defendant presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the

legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services,* 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo,* 220 Conn. 749, 755–56, 601 A.2d 1005 (1992)." (Internal quotation marks omitted.) *United Illuminating Co.* v. *New Haven,* 240 Conn. 422, 431–32, 692 A.2d 742 (1997). Applying these principles, I conclude that the statute is intended to reach only speech or conduct of an employee that, based on its location or circumstance, is or would be protected against governmental, and not private, action.[3] Concomitantly, however, the statute does not reach expressive activity, such as that alleged by the plaintiff, that takes place on a private employer's property and involves only restrictive conduct by his private, nongovernmental employer, because those constitutional guarantees simply do not reach such activity.

I begin with the language of the statute. The core of the protection under § 31-51q is "the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state . . . ." The first amendment of the United States constitution,

---

[3] Thus, for example, had the plaintiff in this case engaged in expressive activity on public property, such as participating in a peaceful demonstration on a town green against the war with Iraq, or had he refused to comply with a *governmental* demand that he display the American flag, whether on public or his own private property; see, e.g., *Wooley* v. *Maynard,* 430 U.S. 705, 717, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977) (New Hampshire constitutionally may not enforce criminal sanctions against persons for refusal to display state motto " 'Live Free or Die' " upon vehicle license plates); his employer could not, consistent with § 31-51q, have disciplined or discharged him based on that activity, because he would have been exercising rights guaranteed to him by the first amendment and article first.

stated generally, guarantees freedom of religion, freedom of speech, freedom of the press, and the rights of peaceable assembly and to petition the government for a redress of grievances. It is axiomatic that the first amendment, which applies to the states through the due process clause of the fourteenth amendment, guarantees those freedoms and rights only against governmental, and not private, action. *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 837–38, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982). Freedom of speech "traditionally has content only in relation to state action—the state must be neutral as to all expression, and must not unreasonably restrain speech or expression. The right *is* to be free of state regulation . . . ." (Emphasis in original.) *Redgrave* v. *Boston Symphony Orchestra, Inc.*, supra, 855 F.2d 904. A necessary corollary of that fundamental constitutional principle is that the first amendment does not guarantee the conduct contemplated by those freedoms and rights where that conduct takes place on private property and is not restricted or coerced by state action in any way. *Lloyd Corp.* v. *Tanner*, 407 U.S. 551, 567, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 56–57, 469 A.2d 1201 (1984). It is also well established that §§ 3, 4 and 14, of article first of the state constitution, which, stated generally, guarantee freedom of religion, speech and the press, and the rights of peaceful assembly and to petition the government for redress of grievances, guarantee those freedoms and rights only against governmental, and not private, action. *Cologne* v. *Westfarms Associates*, supra, 61–63.

Thus, when the legislature referred in § 31-51q to the exercise by the employee "of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state," that language strongly suggests that it was intended to have the same meaning in the statute that it

has in its well established constitutional jurisprudence. That meaning plainly is limited to restriction by governmental action.

It is true that, in colloquial speech, people may refer to their "constitutional right of free speech" in contexts other than governmental interference. That reference, however, is based on an uninformed view of the constitutional guarantee. It is possible, of course, that the legislature had this colloquialism in mind when it enacted § 31-51q. In the absence of a strong showing, however, we should not, as the majority implicitly does, attribute to the legislature a status of being uninformed about the subject matter of its own legislation. There is no such showing here.

Furthermore, the broad sweep of the constitutional protections to which § 31-51q refers, and their general natures, similarly suggest that the statute applies only to governmental action. The statute refers to much more than speech by an employee, and includes the constitutional guarantees of freedom of religion and of the press, and the constitutional rights of peaceable assembly and to petition the government for a redress of grievances. These other expressive constitutional guarantees are normally thought of, even colloquially, only with regard to governmental activity. Although it is possible to conceive of situations in which conduct by a private employer might be seen as interfering with the right to publish a newspaper, it certainly requires some strain on the statutory language to think of factual situations that would fall within that guarantee. Moreover, certain of these other constitutional guarantees are associated *only* with governmental action, and have no discernible application to workplace activity, namely, the first amendment's textual prohibition against the establishment of a religion, and the rights, under both the first amendment and § 14, of article first,

of peaceable assembly and to petition the government for a redress of grievances.

I acknowledge that there is language in the statute that could be interpreted to point to a broader scope of the statute than I have identified. For example, § 31-51q specifically includes "the state and any instrumentality or political subdivision thereof" within the meaning of the term "any employer." That provision, however, is more plausibly read as a specific recognition that, at the least, the state and its subdivisions stand on the same footing as a private employer, and are therefore subject to the same statutory damages action as a private employer, rather than an indication of a legislative intent that the statute reaches private conduct on private premises. *Without* that language, for example, an employee bringing an action under § 31-51q for having been disciplined or discharged by the state for his or her exercise of the specified constitutional rights, might have been met with the arguments that: (1) "any employer" does not include the state, on the basis of an assertion that statutes imposing liabilities on the state must do so with specificity; see, e.g., *Struckman* v. *Burns*, 205 Conn. 542, 558, 534 A.2d 888 (1987) (state not required to pay prejudgment interest where statute does not expressly waive sovereign immunity); and (2) in such a case, therefore, the employee's remedies would be an action under 42 U.S.C. § 1983, or an attempt to fashion a cognizable action directly under the state constitution. Compare *Kelley Property Development, Inc.* v. *Lebanon,* 226 Conn. 314, 316, 627 A.2d 909 (1993), with *Binette* v. *Sabo,* 244 Conn. 23, 25–26, 710 A.2d 688 (1998). *With* that language, however, § 31-51q makes clear that those arguments would be without merit.

It is also true that the proviso in § 31-51q, namely, that the employee's conduct "does not substantially or materially interfere with the employee's bona fide job

performance or the working relationship between the employee and the employer," can be seen as suggesting activity of the employee that might take place at the worksite. That possible inference does not, however, compel a conclusion that the statute was intended to reach such activity. In other words, that language also can be read to refer to nonworksite speech and, therefore, would be consistent with the conclusion, suggested more strongly by the core of the statute, that the statute does not reach private workplace activity.

Furthermore, interpreting the statute to apply to private workplace conduct could—and, in the present case, does—bring two competing sets of expressive rights into conflict, and therefore places the state, in the form of the courts, on one side of that contest. Such a construction raises serious constitutional issues. It is well established that we construe statutes to avoid, rather than to confront, such issues. *Castagno* v. *Wholean*, 239 Conn. 336, 344, 684 A.2d 1181 (1996). The majority, however, places an interpretation on the statute that brings such a confrontation to the fore.

The Massachusetts Supreme Judicial Court has interpreted the Massachusetts Civil Rights Act in just that fashion.[4] The United States Court of Appeals for the

---

[4] The Massachusetts Civil Rights Act provides for a private civil action for equitable relief and damages for any person whose enjoyment of *any* rights secured by either the federal or state constitution has been interfered with, by threats, intimidation or coercion, by "any person or persons, *whether or not acting under color of law* . . . ." (Emphasis added.) Mass. Gen. Laws c. 12, §§ 11H, 11I (1986). Relying principally on the italicized language, the Massachusetts Supreme Judicial Court has held that the legislature "intended to incorporate a proscription on private acts in deprivation of secured constitutional rights," and that the statute applies to conduct between purely private parties. *Bell* v. *Mazza*, 394 Mass. 176, 181–82, 474 N.E.2d 1111 (1985). In *Phelps* v. *President & Trustees of Colby College*, 595 A.2d 403, 405–406 (Me. 1991), the Maine Supreme Judicial Court construed an identical statute, the Maine Civil Rights Act; 5 Me. Rev. Stat. Ann. §§ 4681 through 4683 (West Sup. 1990); to protect expressive rights only against governmental, not private, interference.

First Circuit has cogently identified the constitutional difficulty in the application of the Massachusetts Civil Rights Act where expressive rights are involved. In *Redgrave* v. *Boston Symphony Orchestra, Inc.*, supra, 855 F.2d 890, the plaintiff brought an action against the defendant under that act for canceling her appearance as a narrator of a performance because of her support of the Palestine Liberation Organization. The Court of Appeals stated: "[W]here the issue is the plaintiff's 'right' to free speech, the analogy [to the federal statute prohibiting private racial discrimination] is strained. Such a right traditionally has content only in relation to state action—the state must be neutral as to all expression, and must not unreasonably restrain speech or expression. The right *is* to be free of state regulation, so that all private speech is formally on equal footing as a legal matter. In the traditional context, this means that various private actors can, without state interference, battle it out in the marketplace of ideas.

"In the present case, this application of the statute is made doubly unusual because, unlike in the typical discrimination case, there are free speech interests on the defendant's side of the balance as well. The plaintiff's statutory 'free speech' right against the defendant is to be measured against the defendant's constitutional right against the state. If it were to enforce the statute, the state would be entering the marketplace of ideas in order to restrict speech that may have the effect of 'coercing' other speech.

"We have grave concerns about the implication of such a conflict. If constitutional protections are effectively to protect private expression, they must do so, to some extent, even when the expression (or lack thereof) of one private person threatens to interfere with the expression of another. . . . The courts, noting that free speech guarantees protect citizens against *governmental* restraints upon expression, have hesitated

to permit governments to referee disputes between speakers lest such mediation, even when it flies the banner of 'protecting speech,' interfere with the very type of interest it seeks to protect." (Emphasis in original.) Id., 904.

The same danger applies in the present case. The defendant has a viable expressive interest in seeing that *its* workplace—which *it* owns and in which *its* products are produced—be festooned with American flags. Moreover, it is likely that, in most cases in which an employee claims that his or her right to express himself or herself at the workplace has been stifled by the employer, the employer would have some corresponding expressive interest at stake as well.[5] Interpreting § 31-51q so as to apply to private workplace expression, as the majority does, places the power of the state, in the form of the court that enforces the employee's cause of action; see *Shelley* v. *Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948); on the side of the employee's expressive interest to the detriment of that of the employer.[6] I

[5] I note in this connection that the legislature has enacted a panoply of other statutes that protect employees from retaliatory conduct by their employers for conduct of the employee both on and off the worksite, but that do not embroil the state in aligning itself on the side of one person's right of expression against that of another. See, e.g., General Statutes § 2-3a (where employee serves in state legislature); General Statutes § 31-51m (where employee reports violation of law by employer); General Statutes §§ 31-40k and 31-40o (where employee seeks information regarding toxic substances at workplace); General Statutes § 31-290a (where employee files claim for workers' compensation benefits); General Statutes § 31-379 (where employee files complaint regarding violation of Occupational Safety and Health Act); General Statutes § 51-247a (where employee serves as juror); General Statutes § 52-361a (j) (where employee becomes subject to wage execution); General Statutes § 53-303e (b) (where employee refuses to work on sabbath because of religious observance); General Statutes § 27-33 (where employee is engaged in military duty); General Statutes § 28-17 (where employee engages in civil preparedness or becomes eligible for induction into armed services).

[6] Consider another example. Assume that a private employee, whose workstation is an isolated cubicle, displays in his cubicle in such a way that only he can see it, a swastika, or perhaps a bumper sticker favoring a Ku Klux Klan candidate for public office. Assume further that it does not interfere

would construe § 31-51q so as to avoid that potential constitutional violation.

In addition, the jurisprudential background of § 31-51q, and the drastic consequences that the majority's reading of the statute has in view of that background, support the conclusion that it was not intended to apply in the present case. This statute must be viewed against the background of the established jurisprudence regarding free expression in the workplace. Interpreting the statute so as to apply to speech by an employee at his private employer's workplace necessarily imports into every employment relationship in the state that entire body of very complicated and fact sensitive constitutional jurisprudence. This, in turn, under the majority's interpretation, means that every employer in this state—large and small—would be well advised to consult with a constitutional lawyer before disciplining any employee for any workplace conduct arguably coming within any of the specified constitutional freedoms and rights. That recognition counsels strongly against a broad reading of the statute.

It requires the examination of only two cases to demonstrate this point. In *Connick* v. *Myers*, 461 U.S. 138, 140, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983), the plaintiff was an assistant district attorney in New Orleans, and the defendant district attorney was her employer. Following a dispute between them regarding his desire to

with his job performance, and that for all practical purposes he works alone, so that there is no viable claim that the display will interfere with his relationship with his employer. Nonetheless, his employer demands that he remove it, solely because the employer does not want that kind of expression anywhere on *his* property, and when the employee refuses, the employer discharges him. Applying the statute as the majority in the present case would have us do could require us to force the employer to have his property bear an expression that he does not want, thereby favoring the employee's right of expression over that of the employer. At the least, this would raise serious constitutional concerns, and at the most, it would be a clear violation of the employer's right of expression. See *Wooley* v. *Maynard*, 430 U.S. 705, 717, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977).

transfer her to a different section of the criminal court, the plaintiff had circulated to fifteen other assistant district attorneys a questionnaire soliciting their views concerning the office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in certain political campaigns.[7] Id., 141. The defendant discharged the plaintiff because of her refusal to accept the transfer and because he considered the distribution of the questionnaire to be an act of insubordination. Id. The plaintiff brought an action against the defendant under 42 U.S.C. § 1983, claiming that he had discharged her for exercising her constitutional right to free speech. Id.

The United States Supreme Court, in a five to four decision, analyzed the case as follows. First, as a general matter, the case required the court to arrive at "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (Internal quotation marks omitted.) Id., 142. Second, although the plaintiff's communication was not entirely without first amendment protection, there is also a "common-sense realization that government offices could not function if every employment decision became a constitutional matter." Id., 143. Third, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Id., 146. Fourth, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content,

---

[7] The district attorney in New Orleans is an elected official. *Connick* v. *Myers*, supra, 461 U.S. 149.

form, and context of a given statement, as revealed by the whole record." Id., 147–48. Applying these principles, the court concluded that, with one exception, the plaintiff's questionnaire did not address matters of public concern. Id., 149. The exception was the question that asked whether assistant district attorneys felt pressured to work in political campaigns "on behalf of office supported candidates," which did relate to a matter of public concern. Id.

Because of this exception, however, it was then necessary for the court to engage in the process of balancing the state's interest "in the effective and efficient fulfillment of its responsibilities to the public"; id., 150; against the employee's interest in free expression. That balancing process, however, the court made clear, must be made on a case-by-case basis. The "State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests." Id. Again, "the manner, time and place" of the employee's expression must be weighed in that balance; id., 152; as well as "the context in which the dispute arose . . . ." Id., 153. Applying those very general principles, the court concluded that the defendant had been justified in discharging the plaintiff. Id., 154.

In *Waters* v. *Churchill,* 511 U.S. 661, 664, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994), decided eleven years after *Connick,* the court was confronted with the question of "whether the *Connick* test should be applied to what the government employer thought was said, or to what the trier of fact ultimately determines to have been said." The case involved the public employer's reliance, in discharging the employee, on reports of certain statements purportedly made by the employee at work during a dinner break. Id.

In *Waters*, however, unlike *Connick*, there was not even a majority of the court to answer to that question. A plurality of the court, which included Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Souter and Ginsburg, concluded that the test is what the employer thought was said, but only if the employer undertook an investigation and that investigation is determined later by the judicial fact finder—court or jury—to have been reasonable. Id., 677. Justice Souter, in a separate concurrence, added the proviso that "in order to avoid liability, the public employer must not only reasonably investigate [a] third-party report, but must also actually believe it." Id., 682–83. Thus, in Justice Souter's view, a "public employer violates the Free Speech Clause, that is, by invoking a third-party report to penalize an employee when the employer, despite the report and the reasonable investigation into it, believes or genuinely suspects that the employee's speech was protected in its entirety or in that part on which the employer purports to rely in taking disciplinary action; or if the employer invokes the third-party report merely as a pretext to shield disciplinary action taken because of protected speech the employer believes or genuinely suspects that the employee uttered at another time." Id., 683. In another concurring opinion, Justice Scalia, joined by Justices Kennedy and Thomas, concurred in the judgment, but disagreed with the requirement of a reasonable investigation that the plurality had imposed. Id., 686.

The point of this discussion is not to comment on the policy choice of whether a private employer should be subject to the same rules as is a public employer. That choice is for the legislature, not this court, to decide. These cases illustrate, however, that we should be cautious about interpreting our statute in such a way that would have the potential to embroil every *private* employer that finds the need to discipline or discharge

an employee for workplace misconduct arguably involving the employee's expressive conduct, in the factual and legal complexities involved in reaching these employment decisions.[8] We should not interpret § 31-51q so as to contemplate such drastic consequences without a clear indication of legislative intent to do so.

Finally, the legislative history of § 31-51q is, at best, ambiguous. There is no record of any committee hearings on the bill that eventually became § 31-51q. The debate in the House of Representatives is generally consistent with the view of the statute that I have articulated.[9] The debate in the Senate, however, although

[8] Although the present case involves a large corporate employer, which may well have full-time counsel available to advise it regarding disciplinary or discharging decisions, the statute applies to "any employer" in the state. Thus, the same complex rules would apply to small businesses such as the sole shareholders of Joe's Pizza, Inc.; see *Joe's Pizza, Inc.* v. *Aetna Life & Casualty Co.*, 236 Conn. 863, 864, 675 A.2d 441 (1996); if they wanted to discipline their pizza delivery boy for his refusal to wear a uniform with a small American flag patch on the shoulder. I simply do not think that the legislature intended such a result when it enacted § 31-51q.

[9] In his remarks on the floor of the House, Representative Richard D. Tulisano stated: "Mr. Speaker, this legislation would establish a cause of action for individuals against employers who may be disciplined because of exercising of their first amendment rights. This makes it clear that they do have in fact a cause of action against an employer, and that is exercise of rights which have no way to do with job performance, or on the job, or interfering with their employment. I would move its passage. I think it's important for us to put on the books, legislation which indicates that we are in favor of freedom of speech, freedom of religion, and freedom of the press, and this is our one way of protecting those rights of individuals, so they do not have to be afraid to express themselves because of fear of job loss." 26 H.R. Proc., Pt. 15, 1983 Sess., p. 5289. Representative Tulisano also referred to an individual who was improperly "discharged because of [the employee's] First Amendment rights"; id., p. 5319; and to a cause of action "for individuals who are unjustly fired because of exercising rights protected by the Connecticut and the United States Constitution. . . ." 26 H.R. Proc., Pt. 26, 1983 Sess., pp. 9091–92.

It is true that Representative Tulisano, in his first set of remarks, used the phrase "on the job." Read in context, however, that phrase is simply consistent with the rest of that passage, the thought of which is that an employee should not be disciplined for the exercise of his "first amendment rights," when that exercise does not affect his performance on the job.

also consistent with that view, does offer some slight support for a broader interpretation of the statute.[10] I

[10] The following colloquy occurred between Senator Howard T. Owens, Jr., and three opponents of the bill, namely, Senators Eugene A. Skowronski, John G. Matthews and Anne P. Streeter.

"Senator Owens: This bill, Mr. President, would make any employer, including the state or any municipality, liable to any employee who is disciplined or discharged because such employee exercises under rights guaranteed by the First Amendment to the United States Constitution unless such activity substantially interfered with the employee's bona fide job performance, the liability would be for damages including punitive damages and reasonable attorney's fees. . . .

"Senator Skowronski: Thank you, Mr. President. Mr. President, a question through you to Senator Owens.

"The President: You may proceed.

"Senator Skowronski: Senator Owens, what have been the instances or examples of such discharge in the State of Connecticut that would require passage of this bill which I think has many, many potential problems to it?

"The President: Senator Owens.

"Senator Owens: Mr. President, through you, in some instances private sector employees have been able to speak without fear of retribution. However, in many areas involving federal occupational safety laws, involving labor affairs where complaints have been made, there have been effects borne out on the employees. I hope that answers your question, Senator Skowronski.

"The President: Senator Skowronski.

"Senator Skowronski: Only partly, Mr. President. Have there been cases of discharges and disciplines? Have they been numerous? Through you, to Senator Owens.

"The President: Senator Owens, he has a second question, he wants to know the degree in which there have been any incidents, a more thorough explanation and definition of this.

"Senator Owens: Sometimes, there is not always serious abuses and there might not be a proliferation of complaints coming in, but in order to make sure that the rights are protected under the Constitution of the United States, and also under our State Constitution, we have to make sure that there is a warning and a safeguard going out. So that's why it makes it a very excellent bill.

"The President: Senator Skowronski.

"Senator Skowronski: Thank you, Mr. President. Mr. President, I rise to oppose the bill because I think it really has the potential for creating many, many problems. We are talking about the exercise of First Amendment rights, some of the broadest rights we have the Freedom of Speech, in particular. I think it is going to really create strain and uncertainty in the labor-management area and in the employer-employee relationship to pass this law and to say that someone can't be disciplined or discharged for

do not read this history, however, to suggest that § 31-51q was intended to apply to expressive conduct by a

exercising their right of free speech. I would assume this may give anyone the right to say anything to his employer or any other employee and say, well, I'm just exercising my right of free speech even though the exercise of that right of free speech may have a very adverse impact on the orderly operation of the business, and on the relationship between the employer and the employee. And this is not only going to apply to private industry but it is going to apply to all of our municipalities in the state itself, and I don't think that we should create this kind of or open this kind of a can of worms unless there is a substantial showing that a problem exists out there wherein employers or the state or our towns are disciplining or discharging unfairly employees for exercising their First Amendment rights. I don't think there is such a showing here, and I think that this is just going to create a lot of problems in the workplace for no good reason. So for that reason, I would oppose the bill and ask for a roll call vote.

"The President: Senator Matthews.

"Senator Matthews: Thank you Mr. President. I rise in support of Senator Skowronski's position on the bill. It seems to me that what we have here, as I think has been touched upon, is you have the First Amendment under the Federal Constitution which indicates there are certain elements which are available and free, ah, it doesn't seem to be necessary that we now have to identify that again in the state statutes by providing the kind of a bill that we have here which does, as it has been pointed out, restrict, in my mind at least, a lot of potential employer-employee relationships which already are being tied down severely. I am not going to go into further detail because I think most of the ideas have been expressed. I think that we don't need this bill in the sense that it is indicated in the comments of Senator Owens. I think it is a bill which just adds something more to something that is already in existence through the Federal First Amendment of the Constitution.

"The President: Will you remark further? Senator Streeter.

"Senator Streeter: Mr. President, I also rise to oppose this bill for the same reasons that Senator Skowronski outlined. It seems to me that we have the Federal First Amendment right to cover the general aspect and yesterday we passed the whistle blowing legislation which does guarantee that an employee who is trying to speak out against some sort of an injustice within his workplace does have that guarantee. And in the absence of any dramatic incidents as has been told to us about the need for this kind of legislation, I think it would be far better for us to deny it." 26 S. Proc., Pt. 11, 1983 Sess., pp. 3597–603.

I note in this regard that Senator Owens' references to complaints involving the federal occupational safety laws and "labor affairs," although referring to work related matters, do not necessarily involve statements made by employees at the workplace. Furthermore, those references were immediately followed by Senator Owens' reference to "rights . . . protected under

private employee that is not itself "guaranteed by" either the first amendment or article first, but that *would be* so guaranteed *if* it were engaged in by a *governmental* employee. Therefore, I do not regard this ambiguous legislative history as sufficient to overcome the generally understood meaning of the legislative language, the notion that the legislature should not be presumed to be uninformed about the subject matter of its own legislation, the principle that legislation should be interpreted so as to avoid rather than to raise serious constitutional questions, and the drastic implications of the jurisprudential background of the legislation.

I would, therefore, affirm the judgment of the trial court granting the motion to strike on the ground that § 31-51q does not apply to the facts alleged in the plaintiff's complaint.

---

the Constitution of the United States, and also under our State Constitution," both of which involve protection only against governmental, and not private, infringement.

With respect to the comments of Senators Skowronski, Matthews and Streeter, I note that we do not ordinarily weigh heavily the remarks of *opponents* of a bill in determining its legislative intent because opponents may be motivated to point out difficulties that may arise if the legislative language is subsequently interpreted in a way contrary to the intent of its sponsors. Furthermore, the sponsors' lack of a response to the opponents' arguments is consistent with the view that, because the statute was not intended to reach beyond the constitutional rights as generally understood, the difficulties raised by the opponents were not valid.

Thereafter, moreover, Senator Joseph H. Harper, Jr., explained the bill in terms solely invoking rights guaranteed by the applicable constitutional provisions: "Yes. Mr. President. The bill would make any employer, including the state or any municipality, liable to any employee who is disciplined or discharged because such employee exercised any right guaranteed by the first amendment to the United States, that being freedom of speech, crafts, religion and assembly or of sections 3, freedom of religion, 4, freedom of speech and press or 14, right to assembly for redress of grievances and other proper purposes of the first article of the Connecticut Constitution unless such employee, unless such activity, substantially or materially interfered with the employee's bona fide job performance or the working relationship between the employee and the employer. . . ." 26 S. Proc., Pt. 13, 1983 Sess., p. 4409.

KATZ, J., with whom BERDON, J., joins, concurring in part and dissenting in part. I agree with the majority opinion that General Statutes § 31-51q[1] protects a private employee's expressions[2] against his private employer that occur at the private employer's workplace. Although the majority concludes that § 31-51q does apply to such circumstances, it nevertheless concludes that the Appellate Court properly affirmed the trial court's decision granting the defendant's motion to strike based upon its conclusion that the plaintiff failed to allege a constitutional violation pursuant to § 31-51q. On the basis of the complaint, I cannot conclude that, as a matter of law, the expressions were not protected by § 31-51q. Accordingly, I respectfully dissent.

I

Although the Appellate Court concluded that § 31-51q applies to the present case, it nonetheless determined that the trial court correctly had granted the defendant's motion to strike because, as a matter of law, the plaintiff's expression merely constituted a personal grievance over his working conditions. *Cotto* v. *United Technologies Corp.*, 48 Conn. App. 618, 631–32, 711 A.2d

---

[1] General Statutes § 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

[2] This opinion generally will use the term "expression" to describe any or all of the freedoms guaranteed by the first amendment to the United States constitution and article first, §§ 3, 4 and 14, of the state constitution.

1180 (1998). The complaint provides in relevant part that "[t]he plaintiff declined to display the American flag and further gave his opinion on the propriety of coercing or exerting pressure on employees to display the American flag."

Because the present appeal follows from a motion to strike, the facts alleged in the plaintiff's complaint must be taken to be true, and construed in the manner most favorable to the pleader. *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 68, 700 A.2d 655 (1997). The determination regarding the legal sufficiency of a claim is a conclusion of law, not a finding of fact. Id. Consequently, our review is plenary. Id. Additionally, it is well established that pleadings should be read broadly and realistically, as opposed to narrowly and technically. *LeConche* v. *Elligers*, 215 Conn. 701, 716, 579 A.2d 1 (1990). Accordingly, we must determine whether, as a matter of law, the complaint was legally sufficient. *Novametrix Medical Systems, Inc.* v. *BOC Group, Inc.*, 224 Conn. 210, 214–15, 618 A.2d 25 (1992).

In order to elucidate a private employee's right to free expression pursuant to § 31-51q, it is instructive to examine several decisions of the United States Supreme Court that have carved out the parameters of a government employee's right to free expression under the first amendment to the United States constitution and 42 U.S.C. § 1983.[3] It is undisputed that a government employee does not possess an absolute right to the freedoms of expression guaranteed in the first amendment. *Connick* v. *Myers*, 461 U.S. 138, 146, 103 S. Ct.

---

[3] Title 42 of the United States Code, § 1983, provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

1684, 75 L. Ed. 2d 708 (1983). Furthermore, restrictions on employee-employer speech are more justified than restrictions on speech of the general public. *Waters* v. *Churchill*, 511 U.S. 661, 672, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994). Consequently, the United States Supreme Court has set forth a general rule that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick* v. *Myers*, supra, 146. Thus, absent the most unusual circumstances, purely personal grievances by government or private employees are granted no protection pursuant to § 31-51q. See id., 146–47; *Schnabel* v. *Tyler*, 230 Conn. 735, 751, 646 A.2d 152 (1994).

On the other hand, the court in *Pickering* v. *Board of Education*, 391 U.S. 563, 568–75, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), held that a teacher, by virtue of his public employment, does not relinquish first amendment rights to comment on matters of public interest. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government. . . . Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values . . . ." (Citation omitted; internal quotation marks omitted.) *Connick* v. *Myers*, supra, 461 U.S. 145. Whether an employee's expression addresses a matter of public concern must be determined on a case-by-case basis, examining the content, form and context of the relevant conduct, within the framework of the entire record. Id., 147–48 (examining content, form and context of conduct); *Givhan* v. *Western Line Consolidated School District*, 439 U.S. 410, 415 n.4, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)

(different fact scenarios require different considerations). Although the first part of the inquiry—that is, which topics are considered to be of public concern—is within the province of the trial court to determine as a matter of law, the second part of the inquiry—that is, whether the employee's expressions address such a topic—is within the province of the jury. *Connick* v. *Myers*, supra, 148 n.7; *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 782, 734 A.2d 112 (1999). In order to make such a determination, the jury must, except in the most extreme circumstances, conduct a thorough fact-specific inquiry. See *Connick* v. *Myers*, supra, 147–48; *Daley* v. *Aetna Life & Casualty Co.*, supra, 782. Consequently, the resolution of the second part of the inquiry, the question of fact, is not generally attainable pursuant to a motion to strike.

In the present case, the complaint alleges that "[t]he plaintiff declined to display the American flag and further gave his opinion on the propriety of coercing or exerting pressure on employees to display the American flag." The American flag, the subject of countless actions regarding individuals' constitutional right to the freedom of speech, is a topic that is undeniably a matter of public interest and concern. See, e.g., *Texas* v. *Johnson*, 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (burning of American flag in symbolic protest of governmental policies protected by first amendment); *Street* v. *New York*, 394 U.S. 576, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969) (right to speak in contemptuous terms about flag protected by first amendment). The United States Supreme Court has described the American flag as a "symbol of adherence to government as presently organized." *Board of Education* v. *Barnette*, 319 U.S. 624, 633, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943). Consequently, requiring an employee to display an American flag at his workstation requires him to support the American government. See generally *Elrod* v. *Burns*,

427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (holding that employees of sheriff's office who were not civil servants could not be dismissed for failing to join certain political party).

According to the complaint, the plaintiff took two actions: (1) he "declined to display the American flag"; and (2) he "gave his opinion on the propriety of coercing or exerting pressure on employees to display the American flag." It is well settled that the freedom of speech is also the freedom not to speak, hence the plaintiff's failure to display the flag was speech pursuant to both the federal and state constitutions. See, e.g., *Board of Education* v. *Barnette,* supra, 319 U.S. 624 (finding violation of first amendment rights where state compelled public school students to salute American flag). Moreover, it is undisputed that the government could not compel the plaintiff, or other citizens at large, to display the American flag. See id.

In the present case, the Appellate Court held that the issue of whether the defendant should be able to expect the plaintiff to display an American flag may be a personal grievance involving a working condition, but it does not constitute a matter of public interest. *Cotto* v. *United Technologies Corp.,* supra, 48 Conn. App. 631.[4] The Appellate Court, however, prematurely decided this issue as a matter of law on a motion to strike. The federal courts and this court have developed the law regarding when an employee's particular expression does or does not constitute a public concern. That jurisprudence is instructive as to the circumstances under which the plaintiff will be protected by § 31-51q.[5]

---

[4] If the Appellate Court is correct that the requirement that employees display flags is not a public concern; *Cotto* v. *United Technologies Corp.,* supra, 48 Conn. App. 631–32; then any employer could condition employment on the display of a political symbol, such as a Serbian flag or a swastika, at each workstation.

[5] In order to explicate more fully the law in this area, it is informative to discuss factors not necessarily relevant to the complaint at issue. Hence, I set forth two factors, neither of which are implicated in the present case.

First, as the Appellate Court correctly observed, internal employment policies are not a matter of public concern. Id., 631–32; see also *Ezekwo* v. *New York City Health & Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir.), cert. denied, 502 U.S. 1013, 122 S. Ct. 657, 116 L. Ed. 2d 749 (1991) (personnel decision is not matter of public concern). Whether an expression results from or relates to an employer's policy and whether the event underlying the subject of the employee's expression is primarily of significance to that employee, however, do not diminish the public importance of his concerns. See, e.g., *Branti* v. *Finkel*, 445 U.S. 507, 515–16, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980) (plaintiff's protest of employer's policy requiring employees to affiliate with political campaigns protected by first amendment because policy constitutes coercion of belief in violation of fundamental constitutional rights); *Elrod* v. *Burns*, supra, 427 U.S. 347 (employees of sheriff's office who were not civil servants could not be dismissed for failing to join certain political party where office policy was to employ only such employees affiliated with sheriff's party). Such personal concerns do not alone convert the matter

To begin, the complaint in the present case raises no issue as to audience. I note, however, that an employee's expression does not constitute per se a private grievance if it is communicated only privately to an employer instead of being communicated more generally, such as on the factory floor, or in a public forum. *Givhan* v. *Western Line Consolidated School District*, supra, 439 U.S. 415–16.

In addition, the fact that an expression addresses concerns only about the particular employer, and not other employers, does not transform automatically that expression into merely a private concern. See, e.g., id., 413 (fact that teacher criticized her school district only did not preclude protection by first amendment); *Knapp* v. *Whitaker*, 757 F.2d 827, 840–42 (7th Cir.), cert. denied, 474 U.S. 803, 106 S. Ct. 36, 88 L. Ed. 2d 29 (1985) (teacher's protest regarding his public school's mileage reimbursement, insurance and grievance procedure policies was matter of public concern). In the present case, the complaint provides in relevant part: "The plaintiff . . . gave his opinion on the propriety of coercing or exerting pressure on *employees* to display the American flag." (Emphasis added.) Thus, the complaint, when construed in the light most favorable to the plaintiff, indicates that the plaintiff commented about employees in general.

into an unprotected, purely private grievance. See, e.g., *Givhan* v. *Western Line Consolidated School District*, supra, 439 U.S. 412–13 (speech could be of public interest where teacher criticized school's employment policies and practices that she considered racially discriminatory); *Donahue* v. *Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987) (firefighter's claims of gender based discrimination and Freedom of Information Act violations concerned matters of public interest even though complaints based on fact that wife's job application was rejected and firehouse's practice of closed door board of fire commissioners meetings).

Second, as this court previously has indicated, the employee's motivation is decisive as to whether the expression is a matter of public concern. *Daley* v. *Aetna Life & Casualty Co.*, supra, 249 Conn. 784. The determinative inquiry is whether the speaker's interest arises from his status as a private employee. *Blum* v. *Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994); see also *Lewis* v. *Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999) (must analyze whether speech was calculated to redress personal grievances or whether it was motivated by more general public purpose even if content of speech was generally issue of public concern); *Ezekwo* v. *New York City Health & Hospitals Corp.*, supra, 940 F.2d 781 (examining whether speaker was "on a mission to protect the public welfare" in criticizing quality of physician training program). A person who is motivated by both personal and civic concerns, however, is not denied the protections of § 31-51q as a matter of law. See, e.g., *Donahue* v. *Windsor Locks Board of Fire Commissioners*, supra, 834 F.2d 58. Because a plaintiff's motivation necessarily involves a question of fact to be resolved by a jury; *Daley* v. *Aetna Life & Casualty Co.*, supra, 778; it should not be concluded as a matter of law that the motivation was purely personal.

Beyond proving that the employee's expression is a matter of public concern that should be protected pursuant to § 31-51q, the employee must demonstrate that the employer disciplined or discharged him because of the relevant expression. Causation is an issue of fact for the jury, provided it is pleaded in the complaint. In the present case, the complaint alleges that the defendant suspended and then discharged the plaintiff "on account of the plaintiff's aforedescribed behavior and expression of opinion . . . ." Thus, according to the complaint, construed in the plaintiff's favor, the defendant disciplined and discharged the plaintiff because of his refusal to display the flag and the expression of his opinion about the propriety of requiring employees to do so.

In addition, pursuant to § 31-51q, it must be proven that the employee's expression of public concern did not "substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer."[6] According to first amendment jurisprudence, if an expression is considered to be one of public concern, the issue becomes how to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[7] *Pickering* v. *Board of Education*, supra, 391 U.S. 568. "[T]he [balanc-

[6] As in *D'Angelo* v. *McGoldrick*, 239 Conn. 356, 363, 685 A.2d 319 (1996), I need not reach, and thus I decline to decide, whether the balancing test set forth in *Schnabel* v. *Tyler*, supra, 230 Conn. 749–50, for determining burdens of proof required by 42 U.S.C. § 1983 should be applied pursuant to § 31-51q.

[7] We previously have recognized that "[i]f the statement is political or ideological, it naturally enjoys the fullest protection under the first amendment to the United States constitution and article first, § 4, of the Connecticut constitution." *Grievance Committee* v. *Trantolo*, 192 Conn. 27, 36, 470 A.2d 235 (1984).

ing test] requires that we examine carefully the particular facts and circumstances of the case." *Schnabel* v. *Tyler*, supra, 230 Conn. 750–51. Consequently, pursuant to § 31-51q, both fact-specific concerns must be taken into consideration.

In the present case, the Appellate Court noted in a footnote that the allegations in the complaint implied that the plaintiff's expressions interfered with his relationship with his employer by causing a disturbance among the employees. *Cotto* v. *United Technologies Corp.*, supra, 48 Conn. App. 625–26 n.10. The complaint, however, alleges that "[a]s a result of the plaintiff's refusal to display the American flag and as a direct and proximate result of his comments with respect to displaying the flag, he was subjected to threats and harassment from his coworkers. Said threats and harassment were directed toward him by his coworkers with the *full support and encouragement of the [defendant]*." (Emphasis added.) When the facts are construed in a light most favorable to the plaintiff, they indicate that the defendant, not the plaintiff, caused the threats and harassment. In addition, there is no evidence describing the extent or characteristics of the harassment and threats, where the harassment or threats took place, or the effect that they had on the parties. The extremely fact-specific nature of the necessary inquiry into the disruptiveness of the plaintiff's expressions manifests the factual nature of this particular issue—an issue that should not be decided as a matter of law on the pleadings. "In performing the balancing [test], the statement [at issue] will not be considered in a vacuum; the manner, time and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin* v. *McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987).

In sum, on the basis of the allegations in the complaint, I cannot conclude as a matter of law that the

plaintiff was not raising a matter of public concern nor that his actions "substantially or materially interfere[d] with [his] bona fide job performance or the working relationship between [him] and [his] employer . . . ." General Statutes § 31-51q. Therefore, the trial court should have allowed the plaintiff the opportunity to prove that the defendant had violated the statute.

## II

I now address the basis of my disagreement with that portion of the majority opinion in which, although recognizing that the employment policy at issue could involve a matter of public concern, it nevertheless concludes that the plaintiff has not alleged sufficiently a constitutional violation pursuant to § 31-51q.

To begin, however, I agree that there effectively is no difference between the two scenarios the majority postulates, both of which require the employee to keep a flag on his desk at work. Whether the employee is forced to put it there himself or endure its placement by another person is of little consequence. The right of freedom of thought protected by the first amendment includes both the right to speak freely and the right to refrain from speaking at all. See *Board of Education* v. *Barnette*, supra, 319 U.S. 633–34. Similarly, it is well established that "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind. [Id., 637]." (Internal quotation marks omitted.) *Wallace* v. *Jaffree*, 472 U.S. 38, 51, 105 S. Ct. 2479, 86 L. Ed. 2d 29 (1985). Although "the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate . . . the difference is

essentially one of degree." (Internal quotation marks omitted.) Id. Consequently, in *Wooley* v. *Maynard*, 430 U.S. 705, 714–15, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), when faced with a state measure that forced an individual, as part of his daily life, to be an instrument for fostering public adherence to an ideological point of view that he found unacceptable by requiring noncommercial motor vehicles to bear license plates with the state motto, "Live Free or Die," the court held that "the State [had] 'invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.' "

Just as the right to speak and the right to refrain from speaking are complementary components of a broader concept of an employee's freedom of mind, so too is the employee's freedom to choose his own creed the counterpart of his right to refrain from accepting the creed established by his employer. Therefore, in the present case, whether the flag is exposed to the public is not determinative. The forced association with the flag violates the plaintiff's right not to associate with the speech of others, in this case his employer. The right to proselytize an ideology guarantees the concomitant right to decline to foster such concepts. *Board of Education* v. *Barnette*, supra, 319 U.S. 633–34 (right to refuse to salute flag at school protected by first amendment). Requiring an employee to maintain a flag at his workstation, regardless of whether that message is conveyed to the public at large, forces the employee to be an instrument for fostering adherence to an ideological point of view that he may find unacceptable.

I have some difficulty, however, with what I understand to be the concerns expressed by the majority—that is, that if all employees are forced to keep a flag on their desks, and the public does not have access to the workstations, then it is not reasonable to attribute

the ideology or speech inherent in that symbol to any particular employee. I disagree.

If an employer were to require all employees to keep a swastika at their workstations, even when other employees are the only persons to see such a symbol, the employer effectively forces the employees to associate with his speech and the beliefs identified with the symbol. The employer's conduct serves to create the impression that the employees either espouse the particular ideology affiliated with the symbol or, at the very least, do not find it objectionable. I appreciate the concern that when the only audience is comprised of fellow workers who have been forced similarly to present the symbol, there could be less risk of attribution to any single employee. Nevertheless, I believe that attribution reasonably could be found. I believe the problem is that in this case the symbol is the flag, something *we* are all used to. Were the symbol the swastika, however, attribution would be more apparent. Certainly, no one would comply with that requirement unless he were a true believer in the beliefs associated with that symbol.

Moreover, if an employee, like the plaintiff in this case, does not subscribe to the symbol and the beliefs associated with it, the employee is placed in the position of having to speak out against it, which, of course, presents other problems. The pressure to respond is particularly apparent when the employee takes a position opposed to the view being expressed at his workstation. To require the employee to specify the particular ideas he finds objectionable enough to compel a response would force him to relinquish his "freedom to maintain his own beliefs without public disclosure." (Internal quotation marks omitted.) *Pruneyard Shopping Center* v. *Robins*, 447 U.S. 74, 100, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980) (Powell, J., concurring).

On the basis of the foregoing, I disagree with the conclusion of the majority opinion that the plaintiff failed to allege a constitutional violation pursuant to § 31-51q.

### III

I agree that the Appellate Court correctly held that § 31-51q protects private employee expressions on the premises of a private employer. Contrary to the majority opinion, however, I would conclude that the plaintiff has alleged sufficient facts, which, if proven, establish a cause of action pursuant to § 31-51q.

Accordingly, I dissent.

MCDONALD, J., concurring. I agree that the judgment of the Appellate Court should be affirmed. I do so because, as Justice Borden points out in his opinion, property owners have first amendment rights. The defendant, United Technologies Corporation, Sikorsky Aircraft Division, as the owner of the premises, has the right under our constitution to express its views on the property free of government interference. As Harvard professor Richard Pipes concludes from his study of the failed Soviet system and other totalitarian systems, "[p]roperty is an indispensable ingredient of both prosperity and freedom." R. Pipes, Property and Freedom (1999) p. 286. The freedom to own and control private property is fundamental to freedom. Both the United States Supreme Court and this court have held that a private property owner may exclude the public from entering the premises and expressing its views without the owner's consent. See *Lloyd Corp.* v. *Tanner*, 407 U.S. 551, 567–68, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 61–62, 469 A.2d 1201 (1984). If property owners may control the expression that occurs on their own land, it follows that they have the right, protected by the first amendment of the United States constitution, to express their

own views on their property, free of government interference.

In this case, the defendant, a defense contractor, desired to decorate its premises with American flags during the Gulf war hostilities. The plaintiff, Gonzolo Cotto, an employee of the defendant, refused his employer's order to decorate the area of the defendant's plant in which he worked, and he was fired for insubordination. If any worker employed by the defendant refused the order to hoist the American flag on a company flag pole, the state could not employ § 31-51q to forbid the company from firing that worker. This case is no different.

Moreover, the plaintiff objects in essence to being associated with a premises that displays the American flag. Whether it be flying on top of the defendant's plant, at the plaintiff's workstation, over the town hall, the state or national capitol, or at the nation's borders, the flag represents not only our government, but the country itself. If the plaintiff objects to the display of the American flag, his only real option is to leave the country where it is everywhere displayed. In these circumstances, the plaintiff's complaint properly was dismissed.

Accordingly, I concur with the affirmance of the Appellate Court's judgment.