[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO STRIKE (#103)
This matter comes before the court concerning the defendants' motion to strike both counts of the plaintiff's amended complaint. The court heard oral argument at short calendar on May 28, 2002. For the reasons stated below, the court grants the motion.
 I BACKGROUND
The plaintiff, Dianery DeLaney brought this action against the defendants, The Institute of Living, and Maritza Angulo, through her initial complaint, dated December 24, 2001. The operative complaint is the amended complaint, dated February 8, 2002 (#101) (the "complaint").[1] The amended complaint contains two counts, the first sounding in intentional infliction of emotional distress and the second in negligent infliction of emotional distress.
In the first count, the plaintiff alleges that she was employed at the Hospital as an administrative assistant from 1995 until March, 2001, when the defendants' conduct forced her to leave her job. (See complaint, first count, ¶ 4.) She contends that she enjoyed a good working environment until June, 2000, when Angulo became her supervisor, as program manager of the Hospital's Adult Outpatient Psychiatric Clinic. She asserts that the Hospital knew, at the time she became the plaintiffs supervisor, that Angulo previously had created intolerable working conditions for other employees, forcing them to resign. (See complaint, CT Page 7485 first count, ¶ 5.)
According to the complaint, Angulo "subjected the plaintiff to an abusive and hostile working environment in which hostile glances, abusive language and contemptuous behavior were the norm." (See complaint, first count, ¶ 6.) She alleges that Angulo constantly demeaned her in front of others, "either speaking to her contemptuously or ignoring her at office meetings, and unjustly criticizing virtually every aspect of the plaintiffs work performance." (See complaint, first count, ¶ 6.)
The plaintiff also alleges that in June, 2000, without any reason to do so, and knowing that denial of permission would cause the plaintiff pain and inconvenience, Angulo refused her request for two hours of vacation time so that she could attend a closing. As a result, the closing was delayed, and her husband, who Angulo knew to be physically disabled, was required to attend two closings instead of one. (See complaint, first count, ¶ 7.)
The plaintiff contends that, on June 23, 2000, Angulo conducted a clerical staff meeting without notifying her, and then sent her a letter of warning, in which she "harshly and falsely criticized the plaintiff" and warned that further disregard of job requirements may result in further disciplinary action, including dismissal. (See complaint, first count, ¶ 8.) In the same letter, Angulo falsely and maliciously accused her of failing to attend an earlier clerical staff meeting, when, in fact, Angulo knew that the plaintiff had been given the day off by another supervisor; with Angulo's authorization. (See complaint, first count, ¶ 9.)
More than six months later, on January 17, 2001, Angulo summoned the plaintiff to Angulo's office, turned on a tape recorder without the plaintiffs permission, "and berated her viciously for having spoken to a patient in English, rather than in Spanish, two days earlier." (See complaint, first count, ¶ 10.) Another letter of warning was then put in her personnel file, containing false and malicious allegations of rudeness by the plaintiff while engaged in a telephone conversation with a patient. (See complaint, first count, ¶ 10.) In the same meeting, Angulo ordered her to remove from her work area all articles of personal property, "specifically including religious objects," even though the Hospital had no rule or regulation prohibiting employees from having such property or religious articles in such locations, and only the plaintiff was so treated. (See complaint, first count, ¶ 11.)
On January 25, 2001, the plaintiff complained about Angulo to the Hospital's human resources department and requested a transfer, to a position in which she would not be supervised by Angulo. She was advised CT Page 7486 that "with those letters" she would never get a job within the Hospital. (See complaint, first count, ¶ 12.)
On January 31, 2001, she alleges, Angulo ignored a question from her concerning where Angulo wanted patient charts placed. When she asked the question again, Angulo "began shouting at the plaintiff in the presence of others, ordering her not to ask the same question twice of her or of any other supervisor and stating that Angulo was `the boss' and that `whatever I say goes,' and that `I am the one who gives orders.'" (See complaint, first count, ¶ 13.)
One week later, on February 6, 2001, Angulo rejected the plaintiffs request to be excused from work for religious purposes on Good Friday, April 13, 2001. The plaintiff alleges that Angulo had no reason to do so. (See complaint, first count, ¶ 14.)
Six days afterwards, on February 12, 2001, Angulo again summoned the plaintiff to her office. In the presence of a third party, when the plaintiff looked down, Angulo "shouted at her: `Look at me when I am talking to you!'" (See complaint, first count, ¶ 15.) As a result of Angulo's abusive behavior on this occasion, the plaintiff began to perspire, to suffer nausea, severe anxiety, tightness in her chest, and a sudden and severe headache. (See complaint, first count, ¶ 15.) Angulo responded to the plaintiff's discomfort by stating that she was "`sick and tired' of the plaintiff and added: `You have two choices: be quiet or I will send you home.'" (See complaint, first count; ¶ 15.)
The plaintiff further alleges that, as a result of the plaintiffs emotional reaction to Angulo's abuse, her physician told the plaintiff to take time off from work. In response, Angulo directed a subordinate to call the plaintiff at her home and demand that she immediately return her keys. (See complaint, first count, ¶ 16.) She also claims that her physician instructed her to seek other employment because her health could not survive continuing to work at the Hospital. As a result, she claims she was forced to leave her job. (See complaint, first count, ¶ 17.)
The plaintiff claims that any reasonable person in her position would have felt compelled to resign. (See complaint, first count, ¶ 18.) She claims to have suffered severe emotional distress and economic loss as a result of the defendants' conduct, which she contends was extreme and outrageous and "carried out with the knowledge that it would probably cause the plaintiff to suffer severe emotional distress." (See complaint, first count, ¶¶ 19-20.)
In her second count, the plaintiff incorporates paragraphs 1 through 19 of the first count. In paragraph 20 of the second count she claims that CT Page 7487 the defendants failed to exercise reasonable care in their relationship with her, and "repeatedly engaged in a course of conduct which they should have known would cause the plaintiff, and any normal person similarly situated, to suffer emotional distress so severe that physical illness could result therefrom." (See complaint, second count, ¶ 20.) The plaintiff seeks compensatory damages.
 II STANDARD OF REVIEW
"The purpose-of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted. In ruling on a motion to strike, the court is limited to the facts alleged in the complaint." (Internal quotation marks omitted.) Faulkner v. United Technologies Corp.,240 Conn. 576, 580, 693 A.2d 293 (1997). "The role of the trial court [in ruling on a motion to strike is] to examine the [complaint], construed in favor of the [plaintiff], to determine whether the [plaintiff has] stated a legally sufficient cause of action." (Internal quotation marks omitted.) Dodd v. Middlesex Mutual Assurance Co., 242 Conn. 375, 378,698 A.2d 859 (1997). The court must "take the facts to be those alleged in the complaint . . . and . . . construe the complaint in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) Eskin v. Castiglia, 253 Conn. 516, 522-23, 753 A.2d 927
(2000). "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover . . . [w]hat is necessarily implied [in an allegation] need not be expressly alleged." (Citation omitted and internal quotation marks omitted.) Doe v. YaleUniversity, 252 Conn. 641, 667, 748 A.2d 834 (2000).
 III. DISCUSSION A Intentional Infliction of Emotional Distress
Our Supreme Court recently reiterated the elements which a plaintiff must prove in order to establish a claim for the intentional infliction of emotional distress. In Appleton v. Board of Education of Stonington,254 Conn. 205, 210, 757 A.2d 1059 (2000), the court set forth the four necessary elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and CT Page 7488 outrageous; (3) that the defendant's conduct was the cause of the plaintiffs distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury." (Citations omitted; internal quotation marks omitted.) Id., 210. Thus, the legal sufficiency of a count which alleges the intentional infliction of emotional distress may be tested by a motion to strike. See Dollard v. Board of Education,63 Conn. App. 550, 551 n. 2, 777 A.2d 714 (2001).
"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Appleton v. Board of Education ofStonington, supra, 254 Conn. 210-211. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'. . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted; internal quotation marks omitted.) Id., 211.
Even more recently, our Supreme Court explained that the employment relationship itself necessarily involves certain normal expectations of individuals about conduct, which may involve emotional distress. "It is clear that such individuals reasonably should expect to be subject to routine employment-related conduct, including performance evaluations, both formal and informal; decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; and disciplinary or investigatory action arising from actual or alleged employee misconduct. In addition, such individuals reasonably should expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like. Thus, it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." Perodeau v. Hartford, 259 Conn. 729, 757, 792 A.2d 552
(2002).
As a whole, the conduct described in the complaint is less than "extreme" and "outrageous" in nature. The conduct was less serious than or equivalent to that which was deemed insufficient to sustain a claim for the intentional infliction of emotional distress in several recent CT Page 7489 cases involving somewhat similar conduct. For example, Appleton involved "condescending comments to [a plaintiff] in front of [her] fellow colleagues" in which the plaintiff's ability was questioned. Id. The Supreme Court stated, "[t]hese occurrences may very well have been distressing and hurtful to the plaintiff. They do not, however, constitute extreme and outrageous conduct. . . ." Id.
Dollard v. Board of Education, supra, also concerned allegations bearing some similarity to those involved here. "The plaintiff was employed as a school psychologist by the defendant board of education of the town of Orange (board), and was supervised by the defendants Patricia Miller, Nicholas Tirozzi and John Kowal. . . . In 1998 and early 1999, the defendants jointly engaged in a concerted plan and effort to force the plaintiff to resign from her position or to become so distraught that they would have a colorable basis for terminating her employment. The defendants carried out their plan by hypercritically examining every small detail of her professional and personal conduct. Specifically, the defendants transferred the plaintiff to a school where she did not want to be assigned and then secretly hired someone to replace her at the school from which she had been transferred. The defendants also publicly admonished the plaintiff for chewing gum, being habitually late, being disorganized and not using her time well. Finally, the defendants unnecessarily placed the plaintiff under the intensive supervision of a friend of Tirozzi. The defendants ultimately forced the plaintiff to resign." (Footnote omitted.) Id., 63 Conn. App. 552-553.
The Appellate Court affirmed the trial court's granting of a motion to strike, noting that "[w]hile the conduct alleged here may have been distressful and hurtful to the plaintiff, it was no more extreme and outrageous than the conduct alleged in Appleton." Id., 63 Conn. App. 555.
Likewise, in DeLeon v. Little, 981 F. Sup. 728 (D. Conn. 1997). the court found the following factual allegations concerning the plaintiffs supervisor insufficient: "[d]efendant's alleged outrageous conduct includes her orders to purchase drugs, orders to stand guard while [d]efendant ingested illegal drugs, orders to perform personal errands, orders to perform tasks for a private employer, repeated telephone calls to [p]laintiff at her home, threats to terminate [p]laintiff's employment and replace her with an individual of another race, implementation of discriminatory sick time policies, monitoring of attendance at work, and repeated degrading and humiliating criticism of [p]laintiff in the presence of others." Id., 738 n. 8. The court concluded that "[w]hile [d]efendant's alleged conduct may have been rude, inappropriate, or even criminal, it does not rise to the level of extreme and outrageous as required by Connecticut common law." Id. CT Page 7490
Similarly, in Scandura v. Friendly Ice Cream Corporation, Superior Court, Docket No. 529109, 1996 WL 409337 (Conn.Super. June 27, 1996,Sullivan, Dorsey, Walsh and Sheldon, Js.), the plaintiff alleged that her supervisor engaged in extreme and outrageous conduct "by making her furnish daily sales projections for the restaurant she managed, disallowing her from taking a scheduled vacation for which she had already made airline reservations, and ridiculing her, `unjustifiably, . . . often obscenely,' and in a manner which insulted her integrity, both before and after he learned that she suffered from a medical condition that made her particularly susceptible to emotional distress." Id. In addition, she alleged that another supervisor worsened the effects, "first by forcing the plaintiff to share her job duties with another person, then by demoting her after telling her that she was not a `manager of the 90's.'" Id.
"The initial supervisor sharply criticized plaintiffs job performance. On more than one occasion he termed plaintiffs staff "f_____ lunatics." (Expletive omitted; internal quotation marks omitted.) Id. Additionally, he referred to the plaintiff as "incompetent" and "out of her league." (Internal quotation marks omitted.) Id. The court noted that in plaintiffs own affidavit in opposition to a motion for summary judgment, "she avers that in the wake of her psychiatric difficulties, leave of absence and return to work, [her supervisor] told her on one occasion that she was `playing games' with her health problems." Id. While the court noted that the supervisor's conduct may have been wrong, crude, and unkind, "it can hardly be argued that this conduct was so atrocious or outrageous as to be actionable as intentional infliction of emotional distress. Criticism of employee job performance . . . is an expected, albeit unwelcome and uncomfortable, part of every employee's working life." Id.
A similar result occurred in Valencia v. St. Francis Hospital andMedical Center, judicial district of Hartford-New Britain at Hartford, Docket No. 538867 (April 3, 1996, Hennessey, J.). where the plaintiff alleged that "a critical performance evaluation written by her supervisor . . . spawned a combative and acrimonious relationship between the women." Id. The plaintiff alleged that she was physically and verbally assaulted by her supervisor. See id. The plaintiff alleged that the supervisor "grabbed plaintiffs arm in front of patients and co-workers, pulled her in a back room and yelled at her." (Internal quotation marks omitted.) The court concluded "that the defendant's conduct and the plaintiffs resulting distress [we]re insufficient as a matter of law to satisfy the requisite elements for this claim." Id.
In her brief in opposition, the plaintiff relies on two Connecticut CT Page 7491 appellate decisions, both of which present facts significantly more serious than those alleged here. In Berry v. Loiseau, 223 Conn. 786,790, 614 A.2d 414 (1992), the plaintiff-employee "was subjected to repeated physical abuse by [a company vice president], including being punched and choked." Id., 793. Bell v. Board of Education,55 Conn. App. 400, 739 A.2d 321 (2000) also concerned allegations involving violence, in that case by school officials directed at children, in a school setting. The plaintiffs alleged "that the defendants affirmatively `encouraged, created and tolerated an atmosphere of chaos, disruptiveness and violence,' (emphasis added) that their children were exposed to physical and verbal violence and that the school became a place of fear where learning could not and did not take place." (Emphasis by the Appellate Court, footnote omitted.) Id., 410-411.
In contrast, the plaintiff here makes no allegations concerning violence or an atmosphere involving violence. As noted above, she claims, in part, that Angulo "subjected the plaintiff to an abusive and hostile working environment in which hostile glances, abusive language and contemptuous behavior were the norm." (See complaint, first count, ¶ 6.) Clearly, there is a wide difference between allegations involving violence and those pleaded in the complaint before the court.[2]
In addition, the allegations of abusive language fall well short of that which may be considered "extreme" and "outrageous." For example, there are no allegations concerning the use of racial, ethnic, religious or sexual slurs. See Leone v. New England Communications, Superior Court, judicial district of New Britain, Docket No. 509752 (April 10, 2002, Quinn, J.) (32 Conn.L.Rptr. No. 2, 72). While the remarks alleged here were doubtless painful to the plaintiff, they do not rise to the level of extreme and outrageous since they did not go beyond the pale of communication which may be expected in the employment context. Occasional shouting and comments such as "look at me when I am talking to you," "whatever I say goes," and "I am the one who gives orders" do not rise to the actionable level. Similarly, the allegation that the defendants, through a subordinate, demanded that the plaintiff return her keys after the plaintiff took time off from work, does not amount to conduct "beyond all possible bounds of decency." Appleton v. Board of Education ofStonington, supra, 254 Conn. 210-211.
The allegations include two instances of Angulo falsely and maliciously accusing the plaintiff of failing to do her job properly (the June 23, 2000 letter outlines two occasions in which Angulo accused the plaintiff of missing meetings; in January, 2001, more than six months later, she was accused of being rude to a patient.) These widely separated incidents of false accusation amount, at most, to behavior equivalent to the CT Page 7492 concerted plan to sabotage the plaintiff which the Appellate Court found to be legally insufficient in Dollard v. Board of Education, supra. They fall within the wrongful, yet not extreme and outrageous, conduct which one may expect to encounter in an employment relationship. See Perodeauv. Hartford, supra (it is to be expected that an employee will be subject to "disciplinary or investigatory action arising from actual or alleged employee misconduct").
Likewise, the allegations concerning the refusal to allow the plaintiff to take time off when she wanted to are also part of what may be anticipated in an employment relationship. Concerning the denial of permission to take Good Friday off, the plaintiff does not allege that she was discriminated against on the basis of religion. Our Supreme Court has noted that a failure to accommodate is not the equivalent of religious discrimination. See Corey v. Avco-Lycoming Division, 163 Conn. 309, 322,307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 903,34 L.Ed.2d 699 (1973). "The employer ought not to be forced to accommodate each of the varying beliefs and practices of his employees. . . . [I]t would be economically impossible for the defendant to accommodate itself to individual schedules of employees and continue to maintain a successful and efficient industrial operation." (Citation omitted.) Id., 322-323.
More recently, a refusal by a supervisor to afford compensatory time off to an employee was considered as part of the facts supporting a claim for the intentional infliction of emotional distress. See Anastasio v.Knights of Columbus, Superior Court, judicial district of New Haven at New Haven, Docket No. 396806 (May 21, 1998, Silbert, J.) There, the alleged conduct included physical confrontation, threats of violence, ordering the employee to remain in the supervisor's office so that the employee could not do his job properly, grabbing and forcibly spinning the employee, and spraying him with spittle. While the refusal to approve the time off request was mentioned, it is evident that the allegations inAnastasio involved significantly more serious misconduct than is alleged here. See id.
The direction to remove from the plaintiffs work area all articles of personal property, including religious objects, is similar in nature in terms of its gravity. Again, the plaintiff does not allege that she was discriminated against based on her religion. An employee's work area is not her personal property. See Cotto v. United Technologies Corp.,251 Conn. 1, 18, 738 A.2d 623 (1999). The plaintiff has not claimed that any constitutional right of hers was violated when she was told to remove her personal belongings from her work area. See id., 19-20.
Concerning her husband's physically disabled status, there is no CT Page 7493 allegation that the plaintiff was taunted concerning it or that any action was taken intentionally in relation to his condition. The plaintiff alleges only that Angulo knew that he was physically disabled and that, as a result of the plaintiff not being able to take the time off, he had to attend two closings.
In summary, as a whole, these allegations do not amount to the "atrocious and utterly intolerable" behavior which is necessary to support this cause of action. The conduct alleged is insufficient as a matter of law to meet the standard of "extreme" and "outrageous" conduct which is required in order to sustain a claim for the intentional infliction of emotional distress.
 B. Negligent Infliction of Emotional Distress
As noted, in the second count, the plaintiff repeats the allegations of the first count and claims that the defendants failed to use reasonable care in their relationship with the plaintiff This count, therefore, alleges the negligent infliction of emotional distress.
To sustain such a claim, a plaintiff must also present allegations of extreme and outrageous conduct. "The elements of negligent and intentional infliction of emotional distress differ as to the state of mind of the actor and not to the conduct claimed to be extreme and outrageous." Muniz v. Kravis, 59 Conn. App. 704, 709, 757 A.2d 1207
(2000). Since the second count relies on the same conduct as alleged in the first count, it is likewise legally insufficient, as it does not allege extreme and outrageous conduct.
 C. Constructive Discharge
The court agrees with the final ground raised in the motion to strike, that no separate action for constructive discharge is stated in the complaint. Each count is based on the plaintiff's allegations concerning the infliction of emotional distress. The plaintiff does not contend otherwise.
"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. (Emphasis added.). . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable CT Page 7494 person in the employee's shoes would have felt compelled to resign." (Internal quotation marks omitted and citations omitted.) Brittell v.Dept. of Correction, 247 Conn. 148, 178, 717 A.2d 1254 (1998). To be actionable, an employee at-will's constructive discharge claim must be premised on impropriety "derived from some important violation of public policy." Morris v. Hartford Courant Co., 200 Conn. 676, 679, 513 A.2d 66
(1986).[3] See also Dorlette v. Harborside Healthcare Corp., Superior Court, judicial district of Hartford, Docket No. 266417 (August 9, 1999,Beach, J.) (violation of clear public policy must be alleged; "the mere allegation that a discharge is constructive does not by itself convert a nonactionable discharge of an at-will employee into a viable cause of action.")
Here, except for the emotional distress allegations discussed above, the complaint does not attempt to state how the defendants' conduct violated public policy. Accordingly, no legally sufficient claim is stated for constructive discharge.
Under the circumstances, the court need not address the defendants' argument, raised only in their memorandum, that a claim of negligent infliction of emotional distress cannot be raised in the context of a constructive discharge.
 CONCLUSION
For the foregoing reasons, the defendants' motion to strike the first and second counts of the complaint is granted. It is so ordered.
BY THE COURT
 ___________________ ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT