**Teri TUCKER, Plaintiff,**

v.

**JOURNAL REGISTER EAST, a division of the Journal Register Co., d/b/a The New Haven Register, Defendant.**

No. 3:06CV00307 (DJS).

United States District Court, D. Connecticut.

Nov. 7, 2007.

Jeffrey S. Bagnell, Westport, CT, Stephen P. Horner, Ricci Burnham Carta Carello & Reilly LLP, Darien, CT, for Plaintiff.

Lawrence Peikes, Wiggin & Dana, Stamford, CT, Meghan D. Burns, Wiggin & Dana, New Haven, CT, for Defendant.

### *MEMORANDUM OF DECISION AND ORDER*

DOMINIC J. SQUATRITO, District Judge.

The Plaintiff, Teri Tucker ("Tucker"), brings this action against the Defendant, Journal Register East, a division of the Journal Register Co., d/b/a The New Haven Register ("the Register"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. §§ 46a–60 *et seq.* ("CFEPA"), and Conn. Gen.Stat. § 31–51q, which prohibits an employer from discharging an employee on account of the employee's exercise of First Amendment free speech rights. Specifically, Tucker alleges that the Register terminat-

ed her employment because she was opposed to testifying as a favorable witness in the Register's defense of another employee against whom a sexual harassment complaint had been filed. Now pending before the court is the Register's motion for summary judgment (**dkt.# 25**) pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."). For the reasons stated herein, the Register's motion for summary judgment (**dkt # 25**) is **DENIED**.

## I. FACTS

Tucker filed the complaint in this matter on February 28, 2006. The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, depositions and exhibits.

The Register hired Tucker in August 2000 as a telemarketing manager, a position she held until October 16, 2003, when she was terminated by Kevin Walsh ("Walsh"), the Register's publisher and chief executive officer. Tucker's responsibilities included the hiring and training of a staff of telemarketers, meeting sales goals for various papers published by the Register, and overseeing the telemarketing department.

In 2002, Denise Pecoraro ("Pecoraro"), a telemarketer, filed a complaint with the Connecticut Commission of Human Rights and Opportunities ("CHRO"), claiming she was sexually harassed by her supervisor, and one of Tucker's subordinates, Lee Abrams ("Abrams"). Between December 2002 and February 2003, Tucker aided the Register in preparing a response to Pecoraro's CHRO complaint because, at the time, Tucker believed Pecoraro's accusations against Abrams lacked merit. Additionally, Tucker, in a signed statement, represented that she had never personally observed or overheard any conversations of a sexual nature between Pecoraro and

Abrams. At a deposition, Tucker testified that her statement was entirely true at the time it was made and was not a product of any pressure exerted by the Register.

In April 2003, Tucker spoke to Abrams about sexually inappropriate gestures she personally observed him make in the direction of a female co-worker as the co-worker walked past Abrams. Tucker documented this incident in her own files, but she did not provide the documentation of the incident to the Register's Human Resources Department ("HR") until several months later, when Abrams requested to review his personnel file. In addition, another female employee complained to Tucker that Abrams has stood over her and looked down her shirt. Tucker documented the complaint in a memo for her own set of employee files and issued that document to Abrams as well.

Tucker went on maternity leave thereafter. During this time, allegedly due to her concern about Abram's behavior and the disappearance of checks in her department, Tucker investigated Abrams' criminal background. Tucker apparently discovered that Abrams had been a defendant in several criminal cases in Connecticut and had been convicted of forging numerous checks between 1992 and 1998.

On October 14, 2007, Tucker went to meet with Robert Lee ("Lee"), the HR manager. She brought with her an assembled packet containing, among other things, a copy of Abram's criminal records. With regard to supporting the Register against Pecoraro's CHRO complaint, Tucker allegedly told Lee that "my heart isn't in this anymore after all the things I found out." Lee allegedly replied, "you better just get your heart in it." Tucker also claims Lee stated to her, angrily and very strongly, that "this would not look good for us with the CHRO case." Tucker claims Lee "didn't want to deal with [the pack-

et]." Tucker also assembled packets about Abrams for Walsh and the Register's circulation director, Rich Brest ("Brest").

In October, the Register initiated an investigation concerning the acceptance of collect calls by Tucker. This was in response to a letter penned by Abrams. The Register's investigation revealed that ten collect calls were directed to the Telemarketing Department Extension, and eight of those calls originated from a "Federal Correctional Institute." Tucker contends that the calls may have been directed towards another Register employee working in the telemarketing department who had access to its extension and who was having a romantic relationship with an inmate, presumably the source of the collect calls.

On October 16, 2003, Walsh met with Tucker, along with Brest and Lee. Walsh asked Tucker if she knew a Tavis Rauls ("Rauls"), a criminal defendant and former employee of the Register, and asked whether she had written a letter on behalf of Rauls to the presiding judge detailing Rauls' favorable past work performance at the Register. Tucker acknowledged that she knew Rauls and had written a letter on his behalf in response to a request made by the judge during a court hearing Tucker attended during work hours. Walsh also asked Tucker whether she had accepted any collect telephone calls from Rauls. Tucker stated that she believed she had accepted one such call, but retracted that belief to Walsh approximately fifteen minutes later. A few hours later, Walsh terminated Tucker's employment.

The Register contends that, prior to Tucker's termination, Walsh was not aware of Tucker's hesitancy to testify on behalf of the Register and Abrams, or that Tucker may have found merit in Pecoraro's claims. Tucker counters by alleging that as Lee was a subordinate of Walsh, Walsh could have gained knowledge of her reluctance from Lee, or that Walsh may have inferred her reluctance from the packet Brest gave to him.

The impetus for Tucker's termination is vehemently contested by both parties. Tucker asserts she was terminated in retaliation for her hesitance to testify as a witness on behalf of the Register and Abrams. She claims her reluctance to testify, manifested by her comment to Lee, is the reason she was terminated. Additionally, she highlights the fact that she was not given an opportunity to reimburse the company for the one call she may have accepted, and that the Register's company policy allowed employees to use the phone system for personal reasons if they reimbursed the company.

The Register claims that Tucker was terminated "for accepting a collect call from a prison." The Register's investigation into collect call activity revealed that ten collect calls were directed to the Telemarketing Department Extension, and eight of those calls originated from a "Federal Correctional Institute." Although there is evidence that several other employees may have also accepted collect calls but were not terminated, the Register contends that Tucker's conduct warranted termination because of her management level position, and because she accepted a call from a correctional facility. In addition, Walsh cited Tucker's "poor judgment" in writing "letters of recommendation on behalf of felons that were going for sentencing" as a reason for her termination.

## II. DISCUSSION

■ Tucker alleges that the Register's conduct violated Title VII, CFEPA,[1] and

1. Connecticut courts examine federal precedent for guidance in construing Connecticut's

Conn. Gen.Stat. § 31–51q. The Register argues that Tucker's retaliations claims fail because she has not established a *prima facie* retaliation case, and because she has failed to demonstrate pretext. The Register also argues that Tucker's free speech claim fails because her speech did not pertain to a matter of public concern. The court shall discuss the Register's arguments seriatim.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

■■■ A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Ran-*

*dolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. RETALIATION

■■■ Title VII prohibits retaliation, by any employer, against any of its employees who 1) oppose discrimination prohibited by the statute, or 2) are participating in a Title VII proceeding. *See* 42 U.S.C. § 2000e–3(a). Retaliation claims brought pursuant to Title VII are governed by a burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003) ("The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII.")

■■■ First, a plaintiff bears the burden of establishing a *prima facie* case. "That is, an employee must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005) (in-

anti-discrimination statutes. *See Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996); *Williams v. Quebecor World Infiniti Graphics*, 456 F.Supp.2d 372, 383 (D.Conn.2006). Accordingly, the standards governing Tucker's

CFEPA and Title VII claims are one and the same. *See Vasquez v. Claire's Accessories, Inc.*, 392 F.Supp.2d 342, 349 (D.Conn.2005). Therefore, the court shall analyze Tucker's Title VII and CFEPA retaliation claims together.

ternal quotation marks omitted). "The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the *prima facie* stage has been characterized as 'minimal' and 'de *minimis.*'" *Id.* (quoting *Woodman v. WWOR–TV*, 411 F.3d 69, 76 (2d Cir. 2005)). "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.*

■ Second, "[i]f a plaintiff sustains the initial burden, a presumption of retaliation arises." *Id.* "[T]he onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.; see McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817 ("[T]the burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [adverse employment action].") "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks omitted).

■ Finally, if a defendant does articulate a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff has the ultimate burden to persuade the trier of fact that he or she was victim of illegal retaliation. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir.2001). That is, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], ... and the sole remaining issue [is] discrimination *vel non*

.... " *Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097. "[T]he plaintiff may ... rely on evidence-circumstantial or otherwise-showing that an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz,* 258 F.3d at 81 (internal quotation marks omitted). "Ordinarily, plaintiff's evidence establishing a *prima facie* case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir.2000). Consequently, "unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject," the conflicting initial burdens of the two parties necessitates a factual determination, and summary judgment would be improper. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d. Cir.1995).

### 1. *Prima Facie* Case

To establish her *prima facie* case, Tucker must show that she participated in a protected activity; that the Register knew of the protected activity; that she suffered an adverse employment action; and that there was a causal connection between the protected activity and the adverse employment action.[2]

### a. Protected Activity

The Register first argues that Tucker did not oppose sexually harassing behavior, oppose a directive that she testify falsely, or otherwise participate in a protected activity that would support her *prima facie* retaliation case. The court, however, disagrees.

---

**2.** There is no dispute that Tucker's termination constitutes an adverse employment action. Therefore, the court need only discuss the other three elements of Tucker's *prima facie* case.

■ Title VII forbids an employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The Register's main argument here is that Tucker allegedly did not "oppose any practice" made unlawful under Title VII. But, as the Second Circuit has pointed out, 42 U.S.C. § 2000e–3(a) "has two separate clauses: an opposition clause as well as an independent participation clause." *Deravin v. Kerik,* 335 F.3d 195, 203 n. 6 (2d Cir.2003). Thus, a claim that "is best understood as falling under [the] participation clause ... should not be analyzed solely under the narrower opposition clause." *Id.*[3] That is, if Tucker has shown that her conduct with regard to Pecoraro's CHRO proceeding constitutes "participation" in a Title VII case, she has satisfied her burden.[4]

In *Deravin,* the Second Circuit held that defending oneself against charges of discrimination in a Title VII proceeding constitutes a "protected activity" within the meaning of Title VII. *Id.* at 203–05. The Second Circuit noted that the Title VII's "participate[ ] in any manner" language is broad, and that courts have expansively construed this explicit language. *Id.; see Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1353 (11th Cir.1999). The Second Circuit also noted the Supreme Court's holding that " '[r]ead naturally, the word 'any' has an expansive meaning,' and thus,

so long as 'Congress did not add any language limiting the breadth of that word,' the term 'any' must be given literal effect." *Deravin,* 335 F.3d at 204 (quoting *United States v. Gonzales,* 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997)). Therefore, in *Deravin,* the Second Circuit found that an employee testifying in an employment discrimination case concerning his own allegedly discriminatory action had participated in a Title VII proceeding. *Id.* at 205.

In *Jute,* the Second Circuit furthered its analysis of the scope of Title VII's participation clause. There, the Second Circuit found that an employee who was named as a voluntary witness in support of a co-worker's Title VII discrimination lawsuit, but was never called upon as a witness, had participated in a Title VII proceeding. *Jute,* 420 F.3d at 174–76. In considering the term "participate," the Second Circuit found that Jute had satisfied the plain language of the statute. *Id.* at 174. That is, "because the anti-retaliation clause sweeps broadly through the phrase 'in any manner,' " it may be plausibly argued that "a voluntary witness who had agreed to offer testimony on matters relevant to a Title VII case" " 'ha[d] a part' in or an 'association' with the [Title VII] litigation." *Id.*

The Second Circuit also looked at the statute's overall purpose, noting that

Title VII combats unlawful employment practices, and it does so principally through reliance on employee initiative. In recognition of this fact, Congress en-

---

**3.** Even Tucker's memorandum of law is muddled when making the distinction between these two clauses.

**4.** The parties do not discuss whether a CHRO action constitutes "an investigation, proceeding, or hearing" under Title VII, and it is not clear to the court what the specifics were of Pecoraro's CHRO complaint. The court

notes, however, that a CHRO action, although proceeding before a state, not federal, agency, can nevertheless be brought pursuant to both CFEPA and Title VII. Therefore, the court shall assume that Pecoraro's CHRO case qualifies as "an investigation, proceeding, or hearing" under Title VII.

acted the anti-retaliation clause to shield an employee from employer retaliation following the employee's attempt to challenge discriminatory conduct. The Supreme Court has therefore opined that a primary purpose of [Title VII] is to "[m]aintain[ ] unfettered access to statutory remedial mechanisms." *Id.* at 174–75 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). "It would be destructive of this purpose to leave an employee who is poised to support a co-worker's discrimination claim wholly unprotected." *Id.* at 175. If courts were to find otherwise, "an employer could freely retaliate against a Title VII whistleblower, as long as it did so before the employee actually testified. Placing a voluntary witness into this kind of legal limbo would impede remedial mechanisms by denying interested parties access to the unchilled testimony of witnesses." *Id.* (internal quotation marks omitted).[5]

▉ Here, Tucker alleges she was terminated because she decided not to testify in Pecoraro's CHRO proceeding as a witness for the Register after she had told the Register that she would testify. The court believes that, in accordance with the principles set forth by the Supreme Court in *Robinson,* and by the Second Circuit in *Deravin* and *Jute,* Tucker's conduct is sufficient to qualify as a "protected activity"

under Title VII. To hold otherwise would permit an employer involved in a Title VII proceeding to retaliate against an employee based upon that employee's decision as to what her participation in the Title VII would be. Indeed, Tucker would be "wholly unprotected" if the court were to find that the Register could terminate her because she had changed her mind about testifying on the Register's behalf in the CHRO proceeding.

Furthermore, the court is not convinced that Tucker's statement to Lee ("my heart just isn't in this anymore after all the things I found out") is insufficient, as the Register claims, to generate an inference that she had "assumed an adversarial posture" in the CHRO proceeding. Based on Lee's alleged reaction to Tucker's statement ("you better just get your heart in it"), it is possible to infer that Lee thought that Tucker was changing her mind. At the very least, the court believes that this is an issue best left to the finder of fact. Consequently, the court finds that Tucker has demonstrated her participation in a protected activity that is sufficient to establish her *prima facie* retaliation case.

b. Knowledge of the Protected Activity

▉ The second element of the prima facie case requires the plaintiff to show the employer was aware of this protected activity. "The plaintiff must show a specific basis for imputing the [Title VII viola-

---

5. Additionally, courts outside this Circuit, faced with factual circumstances similar to the facts at bar, have also read the participation clause in a broad and expansive manner to honor Title VII's remedial goals. *See, e.g., Glover v. S.C. Law Enforcement Div.,* 170 F.3d 411, 413–14 (4th Cir.1999) (finding that the use of participation clause claim is not determined based on an employee's testimony regardless of how unreasonable that testimony may be, and to hold otherwise "would do violence to the text of that provision and would undermine the objectives of Title VII."); *Merritt v. Dillard Paper* Co., 120 F.3d 1181 (11th Cir.1997) (holding that the anti-retaliation provision of Title VII reaches to employees who involuntarily participate in such proceedings and employees who do not seek to assist Title VII claimant); *Smith v. Columbus Metro. Hous. Auth.,* 443 F.Supp. 61, 64 (D.Ohio 1977) (holding that "whether an employee decides to assist the charging party, or refuses to assist the ... employer, the employer may not retaliate against the employee, because this decision of the employee constitutes participation in an investigation or proceeding under Title VII.").

tion] to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d. Cir. 2001). In the case at bar, Tucker is not required to put forth undisputable evidence that the superior who ultimately terminated her employment had knowledge of her participation in a Title VII proceeding. That is, Tucker need not show anything more than "general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000); *see Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996) (finding knowledge requirement "easily proved" because the corporate entity was aware of plaintiff's complaints). Furthermore, "a jury ... can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities...." *Gordon*, 232 F.3d at 117; *see Jute*, 420 F.3d at 175. (citing *Gordon* to support conclusion that a jury could divine employer's knowledge of plaintiff's protected activity from circumstantial evidence). Additionally, in *Jute* the Second Circuit indicated that a close temporal proximity between a plaintiff's conduct and an adverse employment action taken against that plaintiff is a factor in finding the requisite knowledge by an employer. *Jute*, 420 F.3d at 175 (finding that plaintiff's removal from company team only one day after being named a witness for plaintiff against their common employer the "most convincing" indirect evidence of employer knowledge).

 Tucker has set forth a sufficient basis upon which a jury could reasonably find that Walsh, as well as the Register, knew of her protected activity when her employment was terminated. The parties do not dispute that Tucker brought documentation of Abram's criminal history to the attention of Lee and Brest. Tucker further testified that Brest took one of the packets she had created to Walsh, and that Brest affirmed Walsh's receipt of the packet to her. Brest was Tucker's immediate supervisor. Lee was a subordinate of Walsh, who is the Publisher and Chief Executive Officer of the Register. All three of the men were present when Walsh summoned Tucker up to his office hours before he terminated her employment, a termination which came two days after Tucker indicated to Lee her reluctance to participate as a witness in the upcoming CHRO proceeding. Thus, the court finds that there is sufficient circumstantial evidence upon which a jury could reasonably infer Walsh knew, from either Brest or Lee, of Tucker's hesitance to participate in Pecoraro's CHRO proceeding on behalf of her employer.

### c. Causal Connection

 The third element to be satisfied is the requirement that a causal connection be shown linking the protected activity to the adverse employment action. This causal connection "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir.2001) (internal quotation marks omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir.2001) (collecting cases). Nevertheless, the period of two days between Tucker's alleged expressed reluctance to testify and her subsequent termination is more than sufficient to establish a causal connection. Therefore, the court finds that Tucker has

satisfied her burden in establishing a *prima facie* retaliation case.

## 2. Legitimate, Nondiscriminatory Reason

Next, the burden shifts to the Register to articulate some legitimate, nondiscriminatory reason for Tucker's termination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097 (internal quotation marks omitted).

 The Register has provided two major reasons for Tucker's termination, which are sufficient to satisfy the Register's burden here. The first reason articulated by the Register is the acceptance of collect calls by Tucker. The company's phone records indicate ten collect calls directed to a Telemarketing Department extension from January to September 2003. Tucker was one of the employees utilizing the extension. The company records also indicate the existence of eight collect calls directed to the Register from a "Federal Correctional Institute." In her meeting with Walsh, Brest, and Lee, Tucker admitted to accepting one such collect call, although she claims she later recanted this admission a few minutes later to Walsh. Walsh testified Tucker was fired "[f]or accepting a collect call from a prison." (Dkt. # 36, Ex. 5, Walsh Depo. at 17.) The source of the calls and Tucker's management level status were additional factors cited by Walsh for Tucker's termination. (*Id.* at 18, 48–49.) The court finds that, with regard to Tucker's alleged acceptance of collect calls, the Register has met its burden.

 The second reason articulated by the Register relates to Tucker's actions on behalf of a Rauls, a criminal defendant and former employee of the Register. The Register claims that Tucker sent two employees, one of whom was Abrams, to testify on behalf of Rauls on company time, and that Tucker appeared in court and wrote a letter to the Honorable Alvin. W. Thompson on behalf of Rauls. Tucker admits that, at Judge Thompson's request, she wrote a letter to Judge Thompson, which spoke favorably of Rauls' performance during his employment at the Register.

In the court's view, Tucker's testimony and letter to Judge Thompson do not constitute legitimate reasons for discharge, notwithstanding the Register's negative opinion of Rauls. Put simply, the court wholly rejects the Register's argument that it could fire Tucker because she participated in a criminal court proceeding by offering testimony and writing a letter. Nevertheless, with regard to Tucker allegedly sending two employees to testify on behalf of Rauls, the court finds that such conduct could be a legitimate reason for termination because it apparently was done on company time without the Register's consent. Therefore, in light of the above, the court thus finds that, except for the allegations regarding Tucker's testimony and letter to Judge Thompson, the Register has satisfied its burden of articulating a legitimate, nondiscriminatory reason for Tucker's termination.

## 3. Pretext

 Finally, Tucker must point to evidence that would be sufficient to permit a rational factfinder to conclude that the the the Register's explanations are merely a pretext for impermissible retaliation. *See Kessler v. Westchester County Dept. of Soc. Servs.,* 461 F.3d 199, 211 (2d Cir. 2006). In the court's view, Tucker has provided sufficient evidence upon which a jury may reasonably determine that the Register's proffered reasons for terminat-

ing Tucker were a pretext for unlawful retaliation.

With regard to the Register's proffered legitimate, nondiscriminatory reasons for Tucker's termination, the court believes that Tucker has shown that these reasons are vulnerable to reasonable disbelief by a jury. Walsh admitted the company cannot be certain Tucker accepted any collect calls, as extension she utilized was shared by other employees. The start of the investigation into the collect calls, as well as the fruits it bore, are closely related in time to Tucker's alleged conversation with Lee and her subsequent termination. The investigation into the collect calls also appears to have been less than exacting. Walsh, the CEO of the Register, fired Tucker personally, but when asked whether employees were asked about accepting collect calls from Rauls or anyone else on an individual basis, Walsh replied "I don't know if that ever happened." (Dkt. # 36, Ex. 5, Walsh Depo. at 27.) He also stated that he did not consider progressive discipline because Tucker was a management level employee, and her actions were "so callous." (*Id.* at 33.) Yet Walsh admitted that there were other Register employees who accepted collect calls, and that none of them were terminated. (*Id.* at 38.)

Furthermore, a former employee of the Register, Deborah Byas ("Byas"), testified during her deposition that it was not Tucker who accepted any collect calls, but other employees, including herself and Lee. (*Id.,* Ex. 4, Byas Depo. at 51–53.) Byas also testified that she told Lee that Tucker had not accepted the collect calls, but Lee "just brushed it off," telling her "[d]on't worry about it." (*Id.* at 52–53.) Therefore, the court finds that, in light of the above, and given the severity of the punishment, a jury could reasonably view the Register's proffered reason for firing Tucker as a pretext for impermissible retaliation.

Consequently, with regard to Tucker's Title VII and CFEPA retaliation claims, the Register's motion for summary judgment (**dkt.# 25**) is **DENIED.**

### C. CONN. GEN. STAT. § 31–51q

■ Section 31–51q of the Connecticut General Statutes reads as follows:

Any employer ... who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

Conn. Gen.Stat. § 31–51q. "In order to state a claim pursuant to § 31–51q, a plaintiff must allege that '(1) [s]he was exercising rights protected by the first amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2)[s]he was fired on account of his exercise of such rights; and (3) h[er] exercise of h[er] first amendment ... rights [ ] did not substantially or materially interfere with h[er] bona fide job performance or with h[er] working relationship with h[er] employer.'" *Campbell v. Windham Comty. Mem'l Hosp., Inc.,* 389 F.Supp.2d 370, 381 (D.Conn.2005) (quoting *Lowe v. AmeriGas, Inc.,* 52 F.Supp.2d 349, 359 (D.Conn.1999)).

■ "Section 31–51q extends protection of rights of free speech under the federal and the state constitutions to employees in the private workplace. The

statute is not limited to freedom of speech in the public arena." *Cotto v. United Techs. Corp.*, 251 Conn. 1, 16, 738 A.2d 623 (1999). The statute does not, however, protect all forms of speech. Section 31–51q "applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen." *Id.* at 17, 738 A.2d 623. "The court must consider, therefore, whether a plaintiff has spoken 'as a citizen upon matters of public concern' or 'instead as an employee upon matters only of personal interest.'" *Campbell*, 389 F.Supp.2d at 382 (quoting *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

■■■ "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record." *DiMartino v. Richens*, 263 Conn. 639, 667, 822 A.2d 205 (2003) (quoting *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684). "An employee's speech addresses a matter of public concern when the speech can 'be fairly considered as relating to any matter of political, social, or other concern to the community....'" *Id.* (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). While a speaker's "motivation is a quintessential issue of fact," *Daley v. Aetna Life and Cas. Co.*, 249 Conn. 766, 778, 734 A.2d 112 (1999), whether the speech is of public concern "involves a question of law for the court," *id.* at 777, 734 A.2d 112. Thus, the motivation behind the speaker's statement may help the court in determining, "regardless of whether the subject matter of a particular statement is of inherent interest to society at large, ... whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Id.* at 780, 734 A.2d 112. Only when the speech relates "exclusively to matters concerning the employee's personal interests, as opposed to matters of

public concern" is there no statutory protection under Sec. 31–51q. *MacKay v. Rayonier, Inc.*, 75 F.Supp.2d 22, 30 (D.Conn.1999).

Here the court must determine whether Tucker, in relaying her reservations about testifying for Abrams and on the behalf of the Register, was speaking "as a citizen upon matters of public concern" or "instead as an employee upon matters only of personal interest." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684. The Register claims Tucker's speech did not pertain to a matter of public concern because whatever statements Tucker may have made solely addressed personal issues. Tucker counters that her speech affected a major public concern: the right to testify truthfully and free from intimidation, in a legal proceeding.

■■■ The court finds that Tucker's speech constituted a matter of public concern, and therefore she may be entitled to relief under the statute. By expressing her reservations to Lee, Tucker was addressing in part her employer's support of another employee's potential guilt concerning sexual harassment in the workplace. A jury could reasonably find that Tucker's speech "was part of an overall effort ... to correct allegedly unlawful practices or bring them to public attention." *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 143 (2d Cir.1993) (internal quotation marks omitted). Tucker's speech relating to her impending testimony did not concern the terms or conditions of her own employment, but rather the change in her views regarding the merits of Pecararo's sexual harassment complaint before the CHRO. She was not speaking strictly from her role as an employee; a jury could believe that she was speaking as witness who was concerned about her testimony at an upcoming proceeding. Moreover, Tucker's reservations about testifying do

388

not necessarily stem from her role as an employee because she learned of Abram's alleged criminal past after conducting research on her own while away from the office on maternity leave. In addition, a jury could believe that Tucker was not furthering only her private interest, but instead the interest of a fellow co-worker, whose allegations Tucker felt were more trustworthy. Tucker's speech was not in response to any personal aggrievement. The court sees no evidence of any animus Tucker may have held against either Abrams or her superiors prior to her termination.

In light of the above, it is not incredible to find that Tucker was speaking "as a citizen upon matters of public concern," rather than "as an employee upon matters only of personal interest." Additionally, in the court's view, a reasonable jury could conclude that Tucker's speech was a substantial or motivating factor in her termination. Furthermore, the Register has presented no persuasive argument describing how Tucker's speech substantially or materially interfered with her bona fide job performance or with her working relationship with the Register. Therefore, the court finds that Tucker has sufficiently stated a claim under Conn. Gen.Stat. 31–51q. Consequently, with regard to Tucker's claim brought pursuant to Conn. Gen.Stat. 31–51q, the Register's motion for summary judgment (**dkt.# 25**) is **DENIED**.

### CONCLUSION

For the foregoing reasons, the Register's motion for summary judgment (**dkt.# 25**) is **DENIED**.